## NORTHWEST UNDERWRITERS, Inc., v. HAMILTON.

### No. 13037.

Circuit Court of Appeals, Eighth Circuit.

Oct. 15, 1945.

Charles F. Noonan, of Minneapolis, Minn. (William L. Prosser and Dorsey, Colman, Barker, Scott & Barber, all of Minneapolis, Minn., on the brief), for appellant.

M. J. Galvin, of Winona, Minn., and G. W. Townsend, of Minneapolis, Minn. (R. H. Fryberger, of Minneapolis, Minn., and Galvin & Beatty, of Winona, Minn., on the brief), for appellee.

Before GARDNER and THOMAS, Circuit Judges, and MILLER, District Judge.

GARDNER, Circuit Judge.

This is an appeal by appellant from a judgment entered against it in an action to recover damages for alleged interference with appellee's insurance agency "expirations." Three parties were joined as defendants below, Northwest Underwriters, Inc., H. P. Thurber, its president, and General Insurance Company of America. The jury, however, returned a verdict in favor of the last two named defendants but against the Northwest Underwriters, Inc. Northwest Underwriters, the appellant, is a corporation, with its place of business at Chatfield, Minnesota, and at the times here material was the general agent for the General Insurance Company of America, a corporation writing property insurance. The contract between General Insurance Company and Northwest Underwriters permitted the latter to enter into contingent commission contracts with sub-agents, and on December 1, 1937, it entered into such a contract with plaintiff Clayton V. Hamilton. This contract specified various rates of commission to be paid Hamilton for insurance that he procured and wrote through Northwest Underwriters. Paragraph 5 of the contract provided as follows:

"In the event of termination of this Agreement, the Agent having promptly accounted for and paid over premiums for which he may be liable, the Agent's records, use and control of expirations shall remain the property of the Agent and be left in his undisputed possession; otherwise the records, use, and control of expirations shall be vested in the Company."

The principal business of Hamilton's insurance agency consisted in the writing of insurance on the properties of the Farmers Union Central Exchange, Inc., or on the cooperative units belonging to that Exchange. The Farmers Union Central Exchange, Inc., was a wholesale farm supply cooperative, handling petroleum products and a general line of farm supplies. From 1936 to 1940, the Hamilton agency had placed the insurance on the properties of the Exchange and it was written in the General Insurance Company through Northwest Underwriters. The Exchange was Hamilton's customer. The principal policy, referred to in the record as the master policy, covered about 200 different properties in North and South Dakota, Montana, Minnesota and Wisconsin. There were several smaller policies, all expiring in May or June of 1940.

Although the insurance was written principally in the General Insurance Company there were some policies written in other companies.

About March 30, 1939, officers or representatives of the Exchange organized the Farmers Union Agency, a corporation having the declared purpose of conducting a general insurance business for itself and others. The Exchange and the Agency had the same officers and directors. The Agency did no business until September 15, 1940, when it first qualified under the laws of Minnesota. In the month of March or April, 1940, one Howard Brissman, active in the Exchange and later in the Agency, called on Mr. Thurber of the Northwest Underwriters, Inc., at Chatfield, Minnesota, and informed him that the Agency was in process of organization for the purpose of operating an insurance agency business, and that it was about to procure proper licenses to operate. He asked Mr. Thurber as to whether or not Thurber or the Northwest Underwriters would be interested in doing business with the Agency and Thurber answered that he knew of no reason why Northwest Underwriters could not or would not do business with that Agency. A later conference, attended by Mr. Thurber and Mr. Seevers, of Northwest Underwriters, and by Mr. Brissman and Mr. Syfestad, of the Exchange, was held at South St. Paul, where the Exchange had its offices. At this conference, held some time in April, Mr. Syfestad, the general manager of the Exchange, told Mr. Thurber that the Exchange was definitely discontinuing any business with Hamilton or his agency, and that no further insurance was going to be placed through Hamilton or his agency. Referring to the conversation held at this conference, Mr. Syfestad, who testified as a witness for the plaintiff, said:

"I told Mr. Thurber that we were discontinuing placing any further insurance through the Clayton V. Hamilton Company and wanted to know from him if the General Insurance Company of America were interested in carrying on that coverage when the policy came up for renewal on June 15, 1940, and he stated that they would be glad to write the insurance as long as we were going to discontinue with the Clayton V. Hamilton Company and wanted to know what agency we wanted it put through and I told him that we were not concerned about what agency it went through but we would not ac-

cept billing from the Clayton V. Hamilton Company on that policy. He wanted to know when that became effective and I said right now, and he said they would be willing to take the insurance.

"Q. That is, then, you had told Thurber at that time that you would not place that insurance, that renewal of that big policy with the General if Hamilton was to have anything to do with it? A. That's right.

"Q. Did you make that statement to him positively? A. Absolutely.

\* \* \* \* \* \*

"Q. If Thurber at that time had stated to you, 'We have a connection with Hamilton and Hamilton will get some insurance —some commission,' would you have allowed that insurance to go to his agency or to the General? A. No, sir.

"Q. And you so informed him? A. Positively.

"Q. Now, I take it from what you say that at that time some disagreements had arisen between the Exchange and Hamilton? A. Yes, sir."

This testimony stands unimpeached and undisputed in the record.

In the latter part of 1940, Northwest Underwriters gave the Agency a check for $1,555.57, which is the exact amount of the Agency's commission on the premium for a single large policy written on the property of the Exchange and one small policy. Referring to the consideration for this check, Mr. Thurber testified that,

"Well, that consideration was based on all policies that had been written during that period from June—from the issuance of the renewal policy, the largest policy, from June 15th for the balance of the period.

\* \* \* \* \* \*

"Q. That was written for commissions from June 15th, 1940 to October, 1940? A. That's right."

Mr. Brissman, on the other hand, testified:

"That check was given to us to defray our expenses from the period September 15 to June 15 for services rendered to the policyholders."

Plaintiff in his complaint alleged that these renewals of 1940 deprived him of renewal commissions to his damage in the sum of $8,000. At the trial, however, it was stipulated that plaintiff would have received on policies renewed by the Exchange with Northwest Underwriters, had the policies been obtained through him, commissions amounting to $2,169.04. It was also stipulated that on the insurance policies that were in fact written direct with the Northwest Underwriters in the General Insurance Company, Hamilton, had the policies been written by him, would have received in renewal commissions the sum of $1,936.46. The jury returned a verdict against Northwest Underwriters alone in the sum of $1,800. It seeks reversal on the grounds that: (1) Its motion for a directed verdict should have been granted as the evidence was insufficient to show any wrongful act on its part; (2) the court erred in instructing the jury; (3) the verdict is perverse and inconsistent in amount and as to parties.

The peculiar relationship existing between the soliciting agent and property insurance companies has given rise to many vexed questions as to the relative rights and responsibilities of the agent and the insurance companies in relation to the property rights in and the use of information accumulated by the agent and embodied in the records made by him in the course of his insurance business. If this information was acquired by the agent while he was acting as agent for an insurance company, then under the law of principal and agent, the ownership of such records obtained during the existence of that agency should belong to the principal. However, the so-called agent or agency solicits business not on behalf of any particular insurance company but on behalf of his agency, and hence, he can not be said to be acting as an agent for any insurance company. Having secured the business, he then places it with whatever company he chooses. When he places the business with some particular insurance company he then becomes the agent for that company. It is in the course of the business of soliciting policies that the agent or agency makes certain records and these, for want of a better name, are referred to as "expirations." This record is in effect a copy of the policy issued to the insured, date of issuance, name of the insured, date of expiration, amount, premium, property covered, and terms of insurance. Port Inv. Co. v. Oregon Mutual Fire Ins. Co., 163 Or. 1, 94 P.2d 734, 124 A.L.R. 1342; Alliance Ins. Co. v. City Realty Co., D.C., 52 F.2d 271. The contract here involved, construed in the light of the well known practice, vests in the agent the property right in his ac-

cumulated information, referred to as "expirations." The information contained in these records enables the agent to a large extent to control the designation of an insurance company to write the insurance and constitutes a salable asset. For any interference with this property right of the agent, the agent may seek redress in the courts. At the time of the acts complained of in the instant case, the contract between plaintiff and Northwest Underwriters, Inc., had not terminated, and during the existence of the agency a covenant of noninterference should be implied, if, indeed, it is not expressed by the use of the words "shall remain the property of the agent." Defendant owed plaintiff the affirmative duty not to interfere maliciously with this property right, and direct evidence of malice is not essential but a malicious intent may be presumed from the intentional commission of a wrongful act. Woodruff v. Auto Owners Ins. Co., 300 Mich. 54, 1 N.W.2d 450.

Plaintiff relies strongly upon the authority of Kerr & Elliott v. Green Mountain Mutual Fire Ins. Co., 111 Vt. 502, 18 A. 2d 164. In that case an insurance agency contract had been terminated and the insurance company then solicited policyholders who had insured through the agency, to renew their policies with its then agent. This was held to be an invasion of the rights of the agent to the full benefit of the "expirations." There are, however, elements in the instant case that were not present in the Kerr & Elliott case. In that case the insurance company solicited the insurance, whereas in the instant case, it was the insured who solicited the insurance company. The insured was under no contract duty in the matter. Again, it appears that there was some disagreement between the agent and the insured, with the merits of which we need not concern ourselves. It appears from the undisputed and unimpeached testimony that defendant was informed that the insurance would not and could not be written by plaintiff. That decision of the insured took all value out of the "expirations" so far as that particular insurance was concerned. The dispute between the agent and the insured was not with reference to what company should write the insurance, but what agent should or should not write it. As has been observed, as between the insured and the plaintiff, this contract was of no effect and did not bind it to renew its insurance through any particular agency. Neither did this contract have the

effect as between the parties to it, of insuring the agent against acts of the insured. Manifestly, if plaintiff was unable to control the re-writing of the insurance policies at their expiration, he lost nothing because of the act of defendant in writing the insurance direct. In the instant case, the defendant has not attempted to appropriate the good will of plaintiff. The insured had a right to place its insurance wherever it pleased and. was certainly under no legal obligation to have it written through the plaintiff agency. Beidler & Bookmyer v. Universal Ins. Co., 2 Cir., 134 F.2d 828. When the insured had eliminated. plaintiff as its agent or broker, defendant, we think, was at liberty to deal directly with the insured. Degnan v. General Acc. Fire & Life Assur. Corp., 161 App.Div. 439, 146 N.Y.S. 360, affirmed 221 N.Y. 484, 116 N.E. 346; Erlin v. National Union Fire Ins. Co., 217 Cal. 374, 18 P.2d 660; Clinchy v. Grandview Dairy, 283 N.Y. 39, 27 N.E.2d 425.

It follows that the court erred in denying defendant's motion for a directed verdict and for judgment notwithstanding the verdict. In view of our conclusion on this question, other questions presented need not be considered.

The judgment appealed from is therefore reversed and the cause remanded with directions to enter judgment in favor of the defendant.