Ingolf H. E. OTTO, Appellant,

v.

IMPERIAL CASUALTY AND INDEMNITY COMPANY, Appellee.

No. 16329.

United States Court of Appeals
Eighth Circuit.

May 11, 1960.

890

Elwyn L. Cady, Jr., Kansas City, Mo., made argument for appellant.

William H. Sanders, Kansas City, Mo., made argument for appellee.

Before GARDNER, VOGEL and VAN OOSTERHOUT, Circuit Judges.

VOGEL, Circuit Judge.

In this diversity action plaintiff-appellant seeks to recover from defendant-appellee compensatory and punitive damages for interference with an insurance agency contract which existed between the parties for a period of approximately six months. The parties will be designated as they were in the District Court. Plaintiff's complaint alleged that he was appointed an agent for defendant insurance company on July 22, 1957; that at that time he disclosed to defendant that the bulk of insurance to be written with defendant would be private passenger car insurance emanating from a single source, to-wit, the insurance counter at the G.E.M. Store in Kansas City, Missouri, which was to be operated by Mr. Milton Gordon; that defendant, " * * * in violation of the principles of the American Agency System, entered into a plan to purloin the 'block of business' generated by Plaintiff" and pursuant thereto, on March 1, 1958, terminated his agency, "noting a spurious reason therefor", and immediately thereafter appointed Milton Gordon as agent; that plaintiff as a result thereof " * * * has sustained irreparable damage to his past, present, and prospective economic advantage in regard to his property interest in the 'block of business' generated by him"; and that defendant's conduct was malicious, willful and " * * * executed with a knowledge of wrongfulness amounting to a wanton disregard of the rights of Plaintiff and the insurance-purchasing public of the United States." Plaintiff asked for compensatory damages in the sum of $18,000.00 and punitive damages of $54,000.00. Defendant moved to dismiss for failure to state a claim on which relief could be granted and to strike that portion of the complaint which sought punitive damages. Plaintiff's suggestions in opposition to the motion to dismiss disclosed that a written contract governed the relationship between the parties, which contract provided that the agency could be terminated by either party at any time and

which contained the following additional provision:

"(6) In the event of termination of this Agreement, the Agent having promptly accounted for and paid over premiums for which he may be liable, the Agent's records, use and control of expirations shall remain the property of the Agent and be left in his undisputed possession; otherwise the records, use and control of expirations shall be vested in the Company."

The trial court denied defendant's motion to dismiss but granted the motion to strike, stating that:

"Although the plaintiff's allegations sound in delicto, they nevertheless present a question of contractual rights, and therefore, he is precluded from recovering punitive damages."

Defendant then answered, affirmatively alleging that plaintiff directed defendant to appoint Gordon its agent, and that " * * * if plaintiff had the right to any expirations or results of Gordon's business, all of which is denied, then plaintiff waived and gave up the same in inducing defendant to appoint Gordon as an agent."

■■ The case proceeded to trial before a jury. At the outset plaintiff attempted, through an expert witness, to establish the custom and practice governing the relationship between an insurance company and its independent general agents under the American Agency System. The trial court properly sustained defendant's objection thereto on the grounds that the relationship of the parties here was solely defined by the written contract between them. Kalberg v. Gilpin Co., Mo.App. St. Louis 1955, 279 S.W.2d 177, 181; State ex rel. Chicago, M. & St. P. Ry. Co. v. Public Service Commission, 1916, 269 Mo. 63, 189 S.W. 377, 379. Thereupon, plaintiff offered to prove:

" * * * that the principle of this custom, trade practice, professional usage is that the agent shall have full and exclusive ownership of business which he generates."

The court correctly sustained defendant's objection to the offer of proof. It might be pointed out, however, that this ruling, of which complaint is made here, is immaterial inasmuch as the written contract provided for exactly what the plaintiff attempted to establish, i. e., the expirations were to remain the property of the agent. In its ruling, the trial court explained:

"This contract, as heretofore quoted, that is, paragraph 6 of the contract, provides definitely what is to be done upon the termination of the contract. That is, at the expiration shall remain the property of the agent and be left in his undisputed possession.

"The contract also provides that the contract may be terminated at will. So, in the opinion of the Court, the only question for determination in this case, in view of the admitted statements of counsel that the contract was terminated * * * the only question is what rights the plaintiff has with respect to the control of expirations, what were expirations and that sort of thing. I think that is the only question for determination, * * * under the terms of this contract, and any other matters will be extraneous and will not be admitted by the Court under the term of 'customs' * * *."

Plaintiff thereupon attempted to prove the value of the Gordon business written by him. He established that the gross premiums during the entire period the contract was in force totalled approximately $10,000.00. Plaintiff's commission from defendant was twenty-five cents of each premium dollar, of which twenty cents went to Gordon. Out of the remaining five cents it was necessary for plaintiff to pay the expenses incurred in handling the business. He, however, failed to make any showing as to the amount of such expenses or the amount of his net profit. There was no basis upon which could be predicated an opin-

ion of the agency's value. Plaintiff did attempt to establish, as a "rule of thumb" for valuing a "block of business", that the expirations of a going agency about to be sold are worth one and one-half to three times the gross annual premiums. This evidence was rejected by the trial court as speculative and conjectural, there being no basis therefor, and additionally because the value of the expirations of an agency to be sold differs from the worth of expirations of an agent who has just been discharged or who has lost his agency contract.

Plaintiff called as a witness one Merlyn B. Martin, a former employee of defendant. He testified that *after* termination of the agency contract Gordon came to see him and suggested that he, Gordon, be appointed defendant's agent. Martin told him that he would first have to contact the plaintiff's agency and ascertain their views on such an appointment. Martin then talked with plaintiff's assistant, Harold Stern, plaintiff being out of town. Stern informed Martin that "he was quite sure it would be O.K. In fact, he told me that it hadn't been a profitable operation for them and suggested that I proceed to set up Gordon as an agent." Martin then discussed the matter of renewals with Marcellus Longan, plaintiff's office manager, who, in turn, " * * * produced her list of expirations and gave me a list of eight or ten, and asked me to handle those direct with Gordon, and on the renewals to bill his agency direct because she said that—reverting back to this five percent commission that they had retained, it wasn't profitable for their office and the sooner we could work direct with Gordon, the better her office would be. In other words, the better she would like it."

Plaintiff, himself, testified that after the defendant cancelled the contract none of Gordon's policyholders asked him to renew their policies, nor did any of them talk to him about their policies, nor did he attempt to contact them. Moreover, he explained that he never intended to approach the policyholders because "it was Mr. Gordon's business that was pur-

loined from me, not that of the individual policyholders", and "Because approaching the individual policyholders and attempting to secure their business direct for myself, and that is cutting out Milton Gordon who did all the work or a large part of the work in securing that business in the first place, would be considered highly unethical and improper, and perhaps even illegal." Plaintiff admitted that after termination of the contract he received from the defendant a number of letters of which the following was typical:

"Re: May Renewals
"Gentlemen:

"We are enclosing a list of your renewals that would be due with this company for the month of May.

"However, inasmuch as your agency contract with this company has been terminated it will not be possible for us to renew these policies for you. We, therefore, assume that you will place them with one of your other carriers."

Milton Gordon was called by the plaintiff and testified only to the fact that he became an agent of the defendant sometime in March, 1958, and that he had contacted Martin, defendant's representative, for this purpose.

At the close of plaintiff's evidence, the trial court sustained the defendant's motion for a directed verdict on the grounds that plaintiff had failed to establish any theory upon which recovery could be had and, additionally, had failed to prove damages.

On this appeal we first consider the court's alleged error in striking plaintiff's prayer for punitive damages. Plaintiff contends that his complaint sounded in tort, and not in contract, and that under the law of Missouri he is entitled to recover punitive as well as compensatory damages. In so doing, he relies principally upon a case from this court, Peitzman v. City of Illmo, 8 Cir., 1944, 141 F.2d 956, certiorari denied 323 U.S. 718, 65 S.Ct. 47, 89 L.Ed. 577, rehearing denied 323 U.S. 813, 65 S.Ct.

112, 89 L.Ed. 647, wherein a suit was brought for actual and punitive damages against a construction company for its tortious and intentional failure to perform a contract to restore the city's elevated steel water tank. There, the plaintiff alleged that the defendant had used the contract as a means of gaining access to the property in order to damage it and engage in other acts for the purpose of accruing excessive charges against the city. Judge Gardner, speaking for this court, explained:

> "Liability in tort may indeed coexist with a liability in contract toward the same person where, independently of the contract, there is a duty which has been violated. Rosenthal & Doucette, Inc., v. United Last Co., D.C.Mass., 33 F.Supp. 213. *Conduct that is merely a breach of contract is, of course, not a tort.*
> \* \* \*
>
> "\* \* \* It will be observed that plaintiff alleges in substance that defendants were not in good faith in carrying out performance of a contract to restore and preserve the structure but were instead using it as a means of gaining access to the property, when, as wreckers and destroyers, they intentionally injured and damaged plaintiff's property. If a tailor, instead of working on the repair of a garment left with him for repair, should use his scissors to cut the garment into shreds, the customer certainly could sue in tort notwithstanding the contract relations of the parties." (Emphasis supplied.) 141 F.2d at page 961.

The circumstances of that case are manifestly distinguishable from the instant action. Here, the only wrong alleged is the violation of that provision of the contract which made the expirations the property of the plaintiff. No harm independent of the contract is asserted. This is not a situation where the "tailor" has damaged the garment, but rather one where he has merely defaulted on his obligation to repair it.

The Supreme Court of Missouri, in Kohnle v. Paxton, 1916, 268 Mo. 463, 188 S.W. 155, 159, stated the rule as follows:

> "\* \* \* a tort is a wrong to another in his rights created by law or existing in consequence of a relation established by contract, but that it cannot be based upon the contract itself; or, stated differently, a duty imposed upon the landlord to make repairs does not arise out of the relation created by the contract, but rests upon an express stipulation in the contract. Being a duty assumed by the contract, its breach does not constitute a tort."

And at page 160 of 188 S.W.:

> "In the cases at bar the petitions sound in tort, but they do not disclose such active negligence independent of the contract as will support an action of this character. In view, therefore, of the strong trend of authority limiting the right of action in such cases to suits for a breach of the contract, we feel impelled to hold that the plaintiffs have mistaken their remedy."

We conclude that the trial court correctly determined that plaintiff's complaint presented only a question of contractual rights.

Under Missouri law, it is clear that punitive damages are not recoverable in an action brought for the mere breach of a contract. Williams v. Kansas City Public Service Co., Mo.1956, 294 S.W.2d 36, 40; Hilderbrand v. Anderson, Mo.App. Springfield 1954, 270 S.W.2d 406, 410; Barton v. Farmers Ins. Exchange, Mo.App. Springfield 1953, 255 S.W.2d 451, 457; Zweifel v. Lee-Schermen Realty Co., Mo.App. St. Louis 1943, 173 S.W.2d 690, 701. In an attempt to avoid that rule, plaintiff alleged that defendant's termination of the contract was for a "spurious reason", was malicious and willful, and a "flagrant and intentional breach of its duty and obligation". However, the motive of one who has the right to terminate a contract at

any time is immaterial and will not sustain a recovery for punitive damages. Where the right exists, the reason for its exercise is unimportant. Christensen v. Prudential Ins. Co. of America, Mo. App. St. Louis 1947, 204 S.W.2d 459, 463; 25 C.J.S. Damages § 120, p. 716. No amount of rationalization can avoid the conclusion that plaintiff's charge against the defendant is only that it breached his contractual right to the expirations. The trial court properly granted the motion to strike that portion of the prayer asking for punitive damages.

■■ Plaintiff next contends that the court erred in granting defendant's motion for a directed verdict. We are compelled to disagree. Plaintiff, himself, testified that the business allegedly purloined was not that of the individual policyholders, the expirations of which he admitted were owned by Gordon and not by him. Rather, the claimed interference was with plaintiff's right to place and renew with defendant the Gordon block of business. Yet, there was here no contention, nor evidence to support it if there were, that Gordon was under any obligation, contract or otherwise, to continue as plaintiff's sub-agent. From all the record discloses Gordon, who developed the business himself, could deal with whomever he chose. After the termination of the contract between plaintiff and defendant Gordon himself elected to and did approach the defendant directly, asking that he be appointed its agent. This case is identical with Woodruff v. Auto Owners Ins. Co., 1942, 300 Mich. 54, 1 N.W.2d 450. There the plaintiff, a general agent, sought damages against the insurance company with which he had a contract for alleged interference with his expirations subsequent to the termination of the agency contract. That court stated:

"For some time prior to the termination of plaintiff's agency a Mr. Keyser, who was a salesman for a biscuit company, as a side line solicited insurance in the defendant company for plaintiff's agency. He would report to plaintiff's office about once a week, and at the time plaintiff's agency was terminated there were about 50 outstanding policies which had been procured by Keyser. But as to these policies plaintiff testified:

"'All of the policies which Mr. Keyser wrote while in my employ, the expiration belonged to him. That was the agreement * * *. I had no property right though in the expirations of these policies * * .'

"Sometime after plaintiff's agency was terminated Mr. Keyser requested the appointment as an agent of the defendant company, and he was appointed as one of its Kalamazoo agents. There is no claim that Keyser was under contract obligation to continue as a subagent of plaintiff. Nor is there any testimony that Keyser had any knowledge of plaintiff's expiration data except that pertaining to the insurance he had written and in which, as plaintiff testified, Keyser possessed the rights in the expirations and expiration data. Nor is there any testimony that defendant permitted Keyser to obtain from it or its records any information of the expirations or expiration data pertaining to policies procured through plaintiff's agency. Surely upon the termination of plaintiff's agency, defendant not only had the right but in the natural course of its business would appoint another agent or agents in the Kalamazoo district. Defendant having done so is not evidence of malice. Under the circumstances of this case, the fact appearing from the record that Keyser may have solicited insurance from some of plaintiff's clientele, the same as any other agent might have done, does not tend to establish malicious interference by defendant with plaintiff's property rights." 1 N.W.2d at page 457.

There, as here, it was the sub-agent who owned the expirations, not the general agent who was apparently trying to collect for them. The situation is also com-

parable to that confronting this court in Northwest Underwriters v. Hamilton, 8 Cir., 1945, 151 F.2d 389, wherein the insured informed the general agent of its unwillingness to continue purchasing its insurance from the sub-agent. The general agent thereupon renewed the policy directly, after which the sub-agent brought suit against it for interference with its expirations. This court reversed a lower court judgment for the sub-agent because:

> "Manifestly, if plaintiff was unable to control the re-writing of the insurance policies at their expiration, he lost nothing because of the act of the defendant in writing the insurance direct." 151 F.2d at page 392.

We thus conclude that plaintiff had no ownership of or control of the Gordon business such as would entitle him to recover in the circumstances here shown by the evidence. Additionally, it should be pointed out that after termination of the contract at the time when Gordon went to the defendant and asked that he be appointed its agent, the defendant, through its representative, Martin, communicated with plaintiff's employees who indicated plaintiff's disinterest in the renewals, cooperated with defendant with reference to them and accordingly waived any complaint which plaintiff might have had for the claimed interferences therewith.

The trial court's sustaining of defendant's motion for a directed verdict must be affirmed for an additional reason. Plaintiff has utterly failed to prove by competent evidence the value of the allegedly purloined business and, hence, has established no damages. No showing was made as to what amount of the likely renewal premiums would remain after the payment of necessary costs in connection therewith. During the entire six months period the contract between plaintiff and defendant was in existence plaintiff estimated that the total of the gross premiums received on the Gordon block of business was $10,000.00. If that be accepted as fact, his net commission thereon, after he had remitted to the defendant and had paid Gordon, was only about $500.00. Admittedly, he had expenses but he utterly failed to establish the amount of such expenses. Insofar as the record is concerned, the Gordon business might have resulted in a loss to the plaintiff. That was certainly indicated by the statements of his assistant and office manager, each of whom termed it "unprofitable" and deemed it undesirable from that standpoint. No other basis was established for showing the value of the expirations as the trial court properly excluded as speculative, conjectural and irrelevant the proffered testimony as to a "rule of thumb" method of valuing the expirations of a going agency. On this question the case is comparable to Fidelity Ins. Agencies v. Citizens Casualty Co. of New York, 7 Cir., 1952, 194 F. 2d 43, 47, wherein the Court of Appeals for the 7th Circuit stated:

> "There is no competent evidence to establish that Fidelity even made any profits as a result of the contract with Citizens. It declared no corporate dividends and the record is absolutely silent as to the expense it was under in carrying on its business. It produced no books of record, or other competent evidence, to show what sums it had received as commission under the contract; there was no evidence as to expenses incurred in carrying out its business and how much, if any, profit it made therefrom."

We have given careful consideration to all of plaintiff's allegations of error and find them to be without merit.

Affirmed.