[redacted]

**SENECA FALLS MACHINE COMPANY, Plaintiff,**

**v.**

**P. C. McBETH and P. C. McBeth, Jr., individually, and trading as McBeth Machinery Company, Defendants.**

**Civ. A. No. 64–526.**

United States District Court
W. D. Pennsylvania.

Aug. 26, 1965.

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

Hubert Teitelbaum, of Morris, Safier & Teitelbaum, Pittsburgh, Pa., for plaintiff.

Malcolm Anderson, of Griggs, Moreland, Blair & Douglass, Pittsburgh, Pa., for defendants.

MARSH, District Judge.

This action, tried non-jury, involves a claim and counterclaims.

It appears in the Complaint and is admitted in the Answer that the plaintiff, Seneca Falls Machine Company (Seneca), agreed orally with the defendant partnership, McBeth Machinery Company (McBeth), whereby the latter was to act as the former's sales representative for its electronics division. It was also alleged and admitted that on or about October 20, 1961, Seneca sold to McBeth an electronic tractor (tracer) for $14,846.00, for delivery to the actual customer, Westinghouse Electric Corporation, at Derry, Pennsylvania. For this sale and other subsequent minor sales to Dana Corporation, McBeth admittedly owes Seneca the sum of $13,536.07,[1] after deducting credits of 10% as sales commissions to which McBeth is admittedly entitled.

Accordingly, judgment will be entered in favor of plaintiff for $16,126.00 (being the principal sum of $13,536.07 with interest in the sum of $2,589.93 calculated to December 29, 1964),[2] plus interest at 6% on the principal sum of $13,536.07 from December 30, 1964.[3]

McBeth's Counterclaim No. 1 asserted a claim for commissions on sales of equipment made by Seneca to Mack Trucks, Inc., in 1961, delivered to Hagerstown, Maryland, which commissions McBeth believed to be in excess of $20,000. For the reasons hereinafter set forth, we have concluded that the defendants are not entitled to recover on this counterclaim.

Counterclaim No. 2 alleged a tortious conspiracy among R. A. Young, Seneca's general sales manager, William D. Pomeroy, agent for the Snyder Machine Company, and Ernest C. Hawkins, a full-time salesman employed by McBeth, which conspiracy was alleged to be successful in its objects and damaged McBeth in excess of $20,000. In our opinion, the evidence was insufficient to establish the alleged conspiracy by a fair preponderance of the evidence. The circumstantial evidence adduced did not prove any of the particulars alleged in the counterclaim beyond mere suspicion. However, we think McBeth is entitled to a $1,500 commission on the sale of a second Seneca electronic machine to Westinghouse Electric Corporation which it proved as an item of damage, but not to the punitive damages claimed for Seneca's alleged wrongful interference in connection with that sale.

*Jurisdiction.*

Seneca is a corporate citizen of New York with its principal place of business in Seneca Falls, New York. P. C. McBeth and P. C. McBeth, Jr., McBeth's partners, are citizens of Pennsylvania. Diversity existing, and the plaintiff's claim being in excess of $10,000, the court has jurisdiction of the parties and the subject matter.

The defendants' counterclaims are permissive. In our opinion, each of the counterclaims alleged to be in excess of $20,000 was asserted in good faith. 1 Moore, Federal Practice, ¶ 0.91[1]. Moreover, it is permissible to aggregate separate counterclaims for the purpose of meeting the requisite jurisdictional amount. McKnight v. Halliburton Oil Well Cementing Co., 20 F.R.D. 563 (N. D.W.Va.1957); Moore, supra, vol. 1, ¶ 0.98[2], and vol. 3, ¶ 13.20. The court has jurisdiction of the counterclaims.

*Pennsylvania Law Applies.*

The parties in their briefs agree that the law of Pennsylvania is applicable, and we concur. Although the litigated oral agreements were made in New York and the performance thereof was to take place in Pennsylvania, Maryland, and other states, McBeth's headquarters were in Pennsylvania and most of its

---

1. See Stipulation, ¶ 5.

2. T., pp. 4–5; our calculation of interest is slightly less than Seneca's.

3. Cf. 5 Corbin, Contracts, § 1051, at p. 308 (1964).

activities under the Seneca franchises would likely have been centered in that state within the contemplation of the parties at the time of the execution of the agreements in issue.[4] We think Pennsylvania is the "center of gravity" and "has the most significant contacts with the matter in dispute".[5] The new Restatement counsels reference to the law of the state with the most significant relationship to the contract when performance is to occur wholly or in substantial part in a state other than that of contracting. Restatement, Conflict of Laws 2d, § 332b. (Tent. Draft No. 6, 1960). As to contracts specifically for the rendition of services, it refers to the "local law of the state where the contract requires that the services, or a major portion of the services, be rendered." Id., § 3461. This is clearly the modern approach.[6]

With respect to the alleged tortious conduct on the part of Seneca and others, its principal operative effect was in Pennsylvania, which state, as the forum state, clearly has more interest in the outcome of this litigation than any other state. Griffith v. United Air Lines, Inc., 416 Pa. 1, 203 A.2d 796 (1964).

### Counterclaim No. 1.

At Seneca Falls, New York, in February, 1960, R. A. Young, representing Seneca's machine tool division, and P. C. McBeth, Sr., representing McBeth, orally agreed[7] that McBeth was to be the exclusive sales representative for Seneca's machine tools in western Pennsylvania, excepting four counties. Seneca agreed to pay a 10% commission on the price of all machine tools sold by McBeth in that territory; no commission was to be paid on the price of electrical equipment added to the machine tools and purchased by Seneca from some other manufacturer. All sales made by McBeth were to be treated as sales to it by Seneca, and from the sales price of any machine tool, it was entitled to deduct a 10% commission.[8]

Seneca promised to reduce the agreement to writing but failed to do so even after being prodded by McBeth (plaintiff's Ex. C). There was no definite agreement regarding the duration of the exclusive agency or its termination.

McBeth was a machine tool sales company of considerable experience, maintaining offices in Pittsburgh and Philadelphia. Three or four salesmen were employed by each office, in addition to secretarial help.[9] One of the Pittsburgh salesmen was Ernest C. Hawkins, who had previously sold Seneca's machinery; his employment was a principal reason for Seneca entrusting its economic well-being in that area to McBeth. The fact that McBeth was in contemplation of both parties to continue to sell the machinery of other manufacturers, not shown to have been competi-

4. See: 8 P.L.E., Contracts, §§ 2, 122, 272; Restatement, Conflict of Laws, §§ 332, 358, 372 (1934).

5. Auten v. Auten, 308 N.Y. 155, 160, 124 N.E.2d 99, 101–102, 50 A.L.R.2d 246 (1954); analyzed in Babcock v. Jackson, 12 N.Y.2d 473, 240 N.Y.S.2d 743, 747–748, 191 N.E.2d 279, 282, 95 A.L.R.2d 1 (1963); Fleet Messenger Service v. Life Insurance Co. of No. Amer., 315 F.2d 593 (2d Cir. 1963); Perrin v. Pearlstein, 314 F.2d 863 (2d Cir. 1963). The Auten case is cited with approval in Griffith v. United Air Lines, Inc., 416 Pa. 1, 203 A.2d 796 (1964).

6. Exchange Nat. Bank of Olean v. Insurance Co. of No. Amer., 341 F.2d 673, 675 (2d Cir. 1965); Goulding v. Sands, 237 F. Supp. 577 (W.D.Pa.1965); 17 C.J.S., Contracts § 12(2); Goodrich, Conflict of Laws, §§ 106–114 (4th ed. 1964); see also, 12A Purdon's Pa.Stat.Ann. § 1–105.

7. See stipulation at p. 2 of the Tr. of the Pretrial Conference.

8. See Complaint, ¶ 4; Answer, ¶ 4; and contentions of parties at pp. 2–5 of the Tr. of the Pretrial Conference.

9. McBeth paid the expenses of office maintenance, secretarial help, and telephone expenses; its salesmen were paid exclusively by commission. No particular amount of expenses was proved for the pertinent period.

tors of Seneca, does not mitigate against a clearly implied covenant that McBeth was to use the best efforts of its sales organization to develop a market for and promote the sale of Seneca's products. The Seneca line by itself would not have supported McBeth's sales organization.

It was the settled custom in the machine tool industry that when a sale was made by one agent for delivery in the exclusive territory of another agent, the commission payable was to be divided 50–50 between the agent making the sale and the agent into whose territory the machine was delivered and the latter was bound to provide any servicing required when the machinery was installed and while being used by the customer.[10] Servicing of machinery generally involved acting as a liaison between the manufacturer and the customer, rendering aid, giving advice, handling the complaints of the customer, and establishing goodwill. This split-commission custom by implication was part of the oral franchise agreement between the parties. Restatement, Contracts, §§ 245, 246(b), 247(c).

Subsequently, in June, 1960, at a meeting in Seneca Falls of R. A. Young, representing Seneca, and P. C. McBeth, Sr. and Robert McBeth,[11] representing McBeth, the exclusive sales territory was expanded to include eastern Pennsylvania, Maryland, and other states.

At some undisclosed place and time prior to October 1, 1961 (defendants' Ex. 4), the subject matter of the oral agreement was enlarged to include machines produced by Seneca's electronics division.[12]

During a period from February 28, 1961 to July 12, 1961, while the oral agreement was in full force and effect, Robert Jones, Seneca's agent for Plainfield, New Jersey, made several sales there of machinery to Mack Trucks, Inc., for installation in the Mack plant at Hagerstown, Maryland, which was within McBeth's exclusive territory.

On July 12, 1961, Seneca terminated the franchise agreement with respect to machine tools for the eastern area, including Maryland.

Another sale to Mack was made on August 4, 1961.

The total contract price of all the sales to Mack was $239,672. The price subject to commission was $196,800.[13] All this machinery was delivered to the Mack plant in Hagerstown, Maryland, and the price paid. The deliveries started on October 24, 1961 (T., p. 37). McBeth performed no services at or after installation.

The commissions due on the sales to Mack were payable 30 days after delivery of the machinery and payment of the purchase price to Seneca by the customer (T., pp. 93, 102).

Seneca paid to the selling agent, Jones, $9,840 which was one-half of the commission due and retained the remaining one-half in "escrow" (T., p. 44).

Prior to the termination on July 12th, McBeth had sold at most $2,000 worth of repair parts manufactured by Seneca (T., p. 89).[14]

---

10. T., pp. 31, 43, 106, 145, 155–156, 183; plaintiff's counsel admitted the custom at p. 10 of the Tr. of the Pretrial Conference, and at p. 2 in plaintiff's Additional Pretrial Statement.

11. In 1960 Robert McBeth was a partner of McBeth Machinery Company and was in charge of the Philadelphia office.

12. See Complaint in which Seneca sues McBeth on the oral agreement for a sale of an electronic machine delivered to Westinghouse Electric Corporation.

13. Included in the total price was the order for machinery priced at $25,960 placed on August 4, 1961, after the franchise agreement had been terminated by Seneca. There was no evidence that a lesser price on this sale was subject to commission.

14. As alleged in the Complaint and admitted in the Answer, the electronic tracer was sold on or about October 20, 1961. There was no proof to the contrary, but see the statement made at argument by Seneca's counsel that the date of this sale was May 29, 1961 (T., p. 236).

■ It is our conclusion that there was a contract governing the relationship of the parties in which the essential terms were expressly or impliedly agreed. 1A Corbin, Contracts, § 155 (1963).

■ Seneca's promise to reduce the contract to writing is not inconsistent with its existence. The actions of the parties indicated that they intended to be bound by the agreed terms regardless of Seneca's promise. Melo-Sonics Corporation v. Cropp, 342 F.2d 856 (3d Cir. 1965), quoting the Pennsylvania law.

For reasons hereinafter expressed, we think the reasons for the termination are irrelevant. No doubt Seneca was dissatisfied with the quantity of sales made by McBeth in western and eastern Pennsylvania, but the evidence is quite convincing that Seneca desired to retain the inchoate split commission for servicing on the Mack sales made by agent Jones, rather than let it accrue as a windfall to McBeth.

■ The controlling legal issue seems to be: Where there is no provision for termination, when is the exclusive sales agency contract under consideration terminable? We conclude that this contract could be terminated by either party at will, or, at most, after a reasonable time; and that Seneca's termination of July 12, 1961 was a reasonable time, it being over four months before the commissions due on the Mack sales became payable, and over one year after the inception of the contract.

In Cummings v. Kelling Nut Co., 368 Pa. 448, 451, 84 A.2d 323, 325 (1951), it is stated:

"The general rule is that when a contract provides that one party shall render services to another, or

shall act as an agent, *or shall have exclusive sales rights within certain territory*, but does not specify a definite time or prescribe conditions which shall determine the duration of the relation, the contract may be terminated by either party at will: [citations omitted]. The burden is on the plaintiff in such cases to overcome the presumption by showing facts and circumstances establishing some tenure of employment: [citation omitted]." (Emphasis ours.)

The evidence does not disclose an intention by the parties that the contract would have a duration beyond a reasonable time.[15]

■ As stated in 17A C.J.S. Contracts § 398, p. 478:

"It is generally the rule that a contract for an indefinite period, which by its nature is not deemed to be perpetual, may be terminated at will on giving reasonable notice * * * and no cause need be assigned."

■ Thus, Seneca, having the legal right to terminate the contract on July 12, 1961, its motive for so doing is irrelevant.[16] Regardless of the business morals which might be involved, the exercise of a legal right can hardly be denominated bad faith.

■ Even if we agree with McBeth that its right to the split commissions vested at the time that Jones made the sales to Mack during the period from February to August, 1961, its share of the commissions was divested by the termination of the contract at least four months before the machinery was installed and the commissions became payable.

After considering all the arguments advanced in behalf of McBeth, it is our judgment that the defendants are not entitled to recover on Counterclaim No. 1.

15. See also, Jackman v. Military Publications, Inc., 350 F.2d 383 (3d Cir. 1965); Restatement, Agency 2d, § 442; 4 Williston, Contracts, § 1027A (rev. ed. 1936);

3 C.J.S. Agency § 204b; 1A Corbin, Contracts, § 152, p. 13 (1963).

16. Cf. Otto v. Imperial Casualty and Indemnity Company, 277 F.2d 889, 893–894 (8th Cir. 1960).

*Counterclaim No. 2.*

On September 27, 1961, following an angry telephone conversation between R. A. Young and P. C. McBeth, Sr., Seneca terminated the machine tool franchise for western Pennsylvania (defendants' Ex. 2).

On the same day, Seneca advised Ernest C. Hawkins that it would turn over its line to his new company (defendants' Ex. 3).

Shortly thereafter, Hawkins terminated his oral contract of employment with McBeth, formed a new company called Controlamatic Company, and took the lines of Snyder Machine Company and Esko Company with him (T., p. 163).

On October 1, 1961, Seneca terminated the electronic machine portion of the franchise, and later turned it over to Controlamatic Company (T., p. 98; defendants' Ex. 4).

■ Prior to September 27th, Hawkins had determined to terminate his employment with McBeth, and P. C. McBeth, Sr. had heard a rumor to that effect. Although the circumstances are suspicious, the evidence was insufficient to find that Seneca induced Hawkins or Snyder Machine Company, through Pomeroy, to terminate their contractual relation with McBeth. There was no evidence that Seneca had wrongfully used confidential information which Hawkins had obtained from McBeth.

We find that the termination by Seneca and Snyder of their respective franchise agreements with McBeth, the transfer of the Seneca and Snyder lines to Hawkins' Controlamatic Company, and the termination by Hawkins of his employment contract with McBeth were in the exercise of legal rights and privileges. While these actions occurred in an atmosphere of acrimony, they were not wrongful acts done pursuant to any conspiracy, wrongful inducement or tortious interference.

■ Proof of conspiracy must be made by full, clear and satisfactory evidence. Proof that Hawkins, Snyder Machine Company and Seneca exercised their independent rights at about the same time will not support a finding of actionable conspiracy. Fife v. Great Atlantic & Pacific Tea Co., 356 Pa. 265, 52 A.2d 24 (1947). Thus we find that the conspiracy as alleged in Counterclaim No. 2 was not established.

In this counterclaim, McBeth complains that Hawkins' Controlamatic Company made "a sale or sales" of Seneca's machinery "to a customer or customers developed while an employee of McBeth."

■ At the pretrial conference, counsel for McBeth stated that it had sold to Westinghouse Electric Corporation a $15,000 Seneca machine on which the commission was $1,500. This commission was claimed as an item of specific damage, and, in addition, exemplary damages were claimed. Although the counterclaim did not specifically sue for the $1,500 commission, McBeth's claim therefor and the related claim for punitive damages were raised at the pretrial conference without objection,[17] and were litigated at the trial as part of Counterclaim No. 2.[18]

It is our opinion that McBeth is entitled to the full 10% commission. The subject of the sale it made to Westinghouse was an electronic machine priced at $15,000; the sale was made prior to the termination of the electronic machine portion of the franchise on October 1, 1961; the Westinghouse order was dated September 28, 1961 (defendants' Ex.

17. Tr. of Pretrial Conference, pp. 14–16.

18. Rule 15(b), Fed.R.Civ.P.; cf. Niedland v. United States, 338 F.2d 254 (3d Cir. 1964); and see, Basista v. Weir, 340 F. 2d 74, 85 (3d Cir. 1965).

6);[19] and the place of delivery was in McBeth's exclusive territory in western Pennsylvania. The order was duly accepted by Seneca.

On January 22, 1962, this order was cancelled by Westinghouse, at the instigation of Seneca, and turned over to Controlamatic Company (defendants' Exs. 4, 5). In due course the machine as modified was delivered to Westinghouse who paid the purchase price to Seneca. One-half the commission on this sale was paid to Controlamatic Company.[20] Seneca never acknowledged that $750 or one-half the commission on the $15,000 sale was payable to McBeth until trial (T., pp. 6, 19–20).

 We think Seneca's contention that McBeth is entitled to only one-half the commission because it did not "service" the machinery is untenable.

First, there was no evidence that the machinery purchased by Westinghouse needed to be or ever was "serviced" by Controlamatic or any other agent.

Second, there was no custom or any express or implied provision in the franchise agreement that the commission for an electronic machine sold by an agent in his exclusive territory should be split with a successor agent, when the machine was delivered and paid for by the customer more than 30 days after Seneca terminated the franchise. Seneca's alleged "policy" that the commission should be split is irrelevant.

As exemplified in its Complaint involving the sale of an electronic tracer *after it had terminated the franchise*, Seneca definitely recognized that it was obligated to pay the full commission on the price of the machine delivered to a customer in the agent's exclusive territory, without regard to the termination or any supposed obligation on the part of the agent to service the electronic machine.

Third, after termination of the franchise, Seneca accepted the benefits of the sale made prior thereto by McBeth. Seneca's acts in paying one-half the commission to Controlamatic, and, until trial, apparently claiming the other half for itself, were acts in bad faith. We think McBeth is entitled to the full commission as if there had been no termination.[21]

Judgment should be entered in favor of McBeth for the sum of $1,500 with interest from March 1, 1962.[22]

However, in our opinion McBeth is not entitled to recover punitive damages.

 In the first place, there was no evidence that McBeth, as seller, contracted to sell the machine to Westinghouse.[23] On the contrary, the seller was Seneca, the order for this machine having been procured from the purchaser, Westinghouse, by McBeth in its capacity as agent. Seneca was contractually obligated to McBeth for the agent's commission of $1,500, but no contractual re-

19. It seems clear in this instance that Westinghouse purchased the electronic machine from Seneca through McBeth (see T., pp. 83–85). This transaction was not treated as a sale by Seneca to McBeth pursuant to the admitted contract between the parties (see ¶ 4 of the Complaint and Answer), whereby McBeth, upon receiving the price from its vendee, would have deducted 10% commission and remitted the remainder to Seneca.

20. The modification increased the price of the machine to $16,800. Controlamatic received $930 commission (T., pp. 60, 91; pretrial Stipulation, ¶ 7).

21. Restatement, Agency 2d, § 454.

22. The date when Westinghouse paid for the machine does not appear in the evidence; we think March 1, 1962 is a reasonable date to start the running of interest since delivery was expected on or about February 15, 1962 (defendants' Ex. 5).

23. This transaction was not proved to be in accordance with the oral contract alleged in the Complaint wherein Seneca, as seller, sold its electronic tracer to McBeth, as purchaser, for a price less 10% commission. See f.n. 19, supra.

lationship existed between McBeth and Westinghouse. It does not appear that it was ever asserted that Westinghouse breached a contract with McBeth. Thus, Seneca did not cause the cancellation of any contract between Westinghouse and McBeth. Seneca simply breached its own contract with McBeth by failing to pay the commission McBeth had earned as agent.

 It is the general rule that punitive damages cannot be recovered for breach of one's own contract.[24]

We think McBeth's reliance on Skeels v. Universal C.I.T. Credit Corporation, 335 F.2d 846 (3d Cir. 1964) for recovering punitive damages is misplaced. Skeels did not involve a breach of contract. In that case the plaintiff proved that willful tortious conduct on the part of the defendant's. employees destroyed his business. The resulting judgment for punitive damages was eliminated for the reason that under the law of Pennsylvania punitive damages may be assessed against a corporation only for wanton, malicious and clearly outrageous behavior on the part of its employees. Skeels v. Universal C.I.T. Credit Corporation, supra; Gerlach v. Pgh. Railways Co., 94 Pa.Super. 121, 133–135 (1928). In our opinion the actions of Seneca's employees surrounding its failure to pay the 10% commission earned by McBeth, albeit in bad faith, did not approach that degree of reprehensible conduct. And this is so even if we attribute substance to McBeth's contention[25] that Seneca's employees tortiously, and without privilege to do so, interfered with some contractual relationship (past or prospective) between McBeth and Westinghouse.

This opinion shall be deemed to embody findings of fact and conclusions of law required by Rule 52, Fed.R.Civ. P., 28 U.S.C.

Appropriate orders will be entered.

24. 5 Corbin, Contracts, § 1077 (1964); Restatement, Contracts, § 342; cf. Glazer v. Chandler, 414 Pa. 304, 200 A. 2d 416 (1964); Otto v. Imperial Casualty and Indemnity Company, 277 F.2d 889 (8th Cir. 1960); Prosser, Torts, § 123, p. 958 (3d ed. 1964).

25. Defendants' Post Trial Brief, §§ III, IV.