**Ted E. GARRETT, Respondent,**

v.

**AMERICAN FAMILY MUTUAL INSURANCE COMPANY, Appellant.**

**No. KCD 26246.**

Missouri Court of Appeals,
Kansas City District.

Dec. 2, 1974.

Motion for Rehearing and/or Transfer Denied
Jan. 28, 1975.

Application to Transfer Denied
April 14, 1975.

---

Watson, Ess, Marshall & Enggas, Douglas Stripp, Paul R. Lamoree, Kansas City, for appellant.

Phillip L. Waisblum, Lem T. Jones, Jr., Jeremiah D. Finnegan, Kansas City, for respondent.

Before DIXON, C. J., and SHANGLER and WASSERSTROM, JJ.

SHANGLER, Judge.

The plaintiff Ted E. Garrett had judgment for $91,507 compensatory and $25,000 punitive damages for the breach of an oral contract of insurance agency and for tortious interference with his property rights under the contract.

The metamorphosis of this litigation bears upon the issues of limitations and damages, so we relate that progression: The action was commenced on January 30, 1958, in the Circuit Court of Jackson County, Missouri, against Farmers Mutual Automobile Insurance Company, Farmers Mutual Services and J. E. Caskey as defendants, by a petition in two counts. Count I alleged breach by defendant Farmers Insurance Company of the agency contract with plaintiff, and Count II alleged that defendants conspired to and tortiously interfered with the property rights of plaintiff in his insurance business. The suit was removed to the Federal Court and, on January 26, 1959, the action was dismissed by the court without prejudice.

The action, this time stated in one count but otherwise intact, was refiled on April 17, 1959, in the state court from whence it had been removed designating Jack O. A. Nelson, assignee of Garrett, as plaintiff. Thereafter, Garrett was resubstituted as plaintiff and American Family Mutual Insurance Company [successor to Farmers Mutual Automobile Insurance Company] and Webb, Incorporated [successor to Farmers Mutual Services] were substituted as parties defendant with J. E. Caskey. [We refer to the defendant insurance company throughout as "Farmers" because all the significant transactions with the plaintiff were concluded under that appellation.] In this posture, the action came on for trial without a jury. At the close of plaintiff's case the action against defendants Caskey and Webb, Incorporated were dismissed with prejudice. No error is assigned to this ruling. The final judgment for plaintiff was accompanied by findings of fact and conclusions of law.

*The Evidence*

The plaintiff Garrett established a general insurance agency in Johnson County, Kansas in May of 1948 to which he devoted full time. He represented, up to the time of trial, several casualty, fire and life insurance companies, and always for compensation on a commission basis. In the summer of 1949, Garrett was invited by Clint Grantier, Farmers State Director for Kansas, to represent Farmers in Johnson County and environs. On July 8, 1949, Garrett submitted written application for appointment as an agent for Farmers, and within days, he received written appointment from the company, and thereafter was licensed and received the company rate book and agent manual.

As to the terms of the agency agreement, Garrett testified that at the time of his recruitment Grantier represented to him that it would be Garrett's obligation to promote Farmers at his own expense, and in turn, he would receive an eight percent commission of insurance business written;

that once Garrett had forwarded to Farmers the written applications for insurance, the company would process the paper work at the home office in Madison, Wisconsin; that Garrett could write insurance for Farmers for as long as the company operated in the territory, but that the agreement was terminable, without more, by either party. Garrett was assured that his right to represent other insurers was unimpaired; that he was, in effect, building his own business so that in the event of termination of agency, Garrett would own his expirations and renewals [1] and Farmers would not interfere with them. Grantier could not recall the exact account of the conversation, but acknowledged that his responses would have been as related by Garrett. Grantier did confirm, however, that he informed Garrett that Farmers did not deal through captive agents but through those who owned their own businesses.

Thereafter, Garrett began soliciting and selling automobile insurance for Farmers. In 1951, Lyman Spray became District Manager for Farmers and summoned Garrett to his office. Spray, who received overwrites on the commissions earned by the agents in his district, exhorted Garrett to greater effort. Garrett then mentioned Grantier's representations, which Spray confirmed. Spray assured him that his arrangement with Grantier was valid and that no written contract with Farmers was necessary.

Garrett soon became one of Farmers most productive agents. For the year 1953, Garrett was the top producer of casualty business in Kansas and was third in rank for the production of new casualty business in Kansas and was third in rank for the production of new casualty business company-wide. In that year he wrote 751 new casualty policies and 68 fire policies and received a bonus for his premium production. Garrett also received top underwriting bonuses for years 1953 and 1954 based upon favorable loss ratios on policies written by him for the previous three years.

The incidence of unfavorable loss ratios in the large population areas prompted Farmers to announce the Metropolitan Area Plan at the Kansas state convention in April of 1954. The plan designed to supplant the independent agency system then extant by a system of captive agents. Under this plan, agents in the areas affected would be required to represent Farmers exclusively or face termination of their contracts. This proposal caused immediate consternation to Garrett and other agents. Garrett promptly got in touch with Spray, the district director, and Grantier, the state director, for fuller information and was told the announced policy would be adopted: the only alternatives were to divest all other business and represent Farmers only or to be terminated. Shortly thereafter, a three-agent committee, including Garrett, met with the chief executive officer of the company and with the agency director in Madison, Wisconsin. They confirmed the plan would be given effect; that the alternatives open to the agents were acquiescence or cancellation. Garrett at no time agreed to the new policy.

After he returned home, Garrett received a letter from Kinnamon, agency direc-

1. The term "expiration" has a well recognized meaning in the insurance industry: It embodies the records of an insurance agency by which the agent has available a copy of the policy issued to the insured or records containing the date of the insurance policy, the name of the insured, the date of the expiration, the amount of insurance, the premium cost, property covered and terms of insurance. This information enables the agent to solicit the insured before the existing contract of insurance expires and arms him with the information essential to secure another policy and to offer the insured a solution for his insurance needs.
Phillips & Co. v. Pennsylvania Threshermen & Farmers Mutual Casualty Ins. Co., 199 F.2d 244, 246 [1] (4th Cir. 1952) ; Northwest Underwriters, Inc, v. Hamilton, 151 F.2d 389, 391 [1–3] (8th Cir. 1945) ; Couch on Insurance 2d, § 26:428.

tor, dated April 23, 1954, which acknowledged the meeting and established January 1, 1955 as the date the plan would be put into effect in Garrett's area.

Farmers experienced major personnel changes as it tried to convince its agents to accept the plan. [Only about six of forty-two agents in the district acceded to the new arrangement.] Spray resigned from Farmers in July of 1954 because the new plan was directly contradictory to the advisements he had made to his agents in the past that they owned their own businesses. Grantier was reduced from state director to district director to fill the position vacated by Spray. Grantier had tried unsuccessfully to get Garrett to agree to the plan, but because he was also opposed to the plan, he, too, left the company within a few months.

Garrett and retained counsel met with the district supervisor and state supervisor for Farmers on December 13, 1954 and Garrett was then shown a memorandum on "Agent-Company Relations" which embodied the provisions of the Metropolitan Area Plan to be effective January 1, 1955. Garrett was asked to subscribe an acceptance of this plan, but refused. The provisions to which Garrett objected were the new requirements (1) that he represent Farmers exclusively and not represent other companies (2) that agents meet certain minimum production standards (3) that if terminated, his business would be assigned to another agent who would remit to him as terminated agent renewal commissions for twelve months (4) that successor agents would be furnished all new information and data on file concerning his clients and (5) that the company reserved the right to continue to mail premium notices, renewal certificates and cancellations to policyholders after termination of an agency.

Then on December 21, 1954, Garrett received a letter of cancellation of agency from Kinnamon, to be effective February 1, 1955. Garrett was informed by letter of February 10, 1955 that his Farmers license had been cancelled.

In contemplation of the approaching termination Garrett had begun to write new business and place policies which had expired in companies other than Farmers. In the last six months of 1954 Garrett sold only 24 casualty policies in Farmers compared to 192 such policies sold in the first six months of the preceding year.

On January 14, 1955, Garrett's attorney advised Farmers by letter that Garrett had a property interest in his expirations and renewals and that any effort by Farmers to transfer his business to a successor agent would be a breach of contract and invasion of these property rights, and further requested that Farmers not send renewal notices upon termination of the agency. Farmers responded by letter of January 19, 1955 that the company would continue its customary policy of sending out renewal notices and certificates, even after termination of Garrett's agency, and that the company would name a new agent to service its policyholders. [Grantier, on the other hand, testified that the procedure whereby renewal notices, and especially termination notices, were sent to the policyholders of terminated agents, was new to him.]

Garrett's agency terminated on February 1, 1955 and Farmers appointed Dwayne Marsden as his successor agent beginning March 1, 1955. Farmers furnished Marsden with information concerning Garrett's policyholders. Then on March 9 and 10 letters in this form were mailed to Kinnamon to Garrett's policyholders:

We wish to announce that Mr. Ted Garrett, who was your agent, is no longer with this company. Therefore, we have named Mr. Dwayne V. Marsden, 2120 South 48th Street Terrace, Kansas City, Kansas, as your new servicing agent.

Your company is desirous of providing prompt and efficient claims service to its policyholders at all times. You will find

Mr. Marsden well qualified to service your policy if you need service.

It is a pleasure to furnish you with broad insurance protection and good service at a reasonable cost.

Even before the receipt of his termination letter from Farmers, Garrett received calls from his policyholders that they had been solicited by other Farmers agents. Garrett learned the identity of those agents, who were licensed in Missouri, called them to object to their solicitations and made formal complaint to the Kansas Commissioner of Insurance because they were not licensed in Kansas. Garrett testified, on cross-examination, that on the basis of reports from his policyholders, the Missouri agents had succeeded in alienating some of his clients.

### The Judgment of the Trial Court

The trial court found that the acts of defendant Farmers in the solicitation of Garrett's policyholders through other agents, both before and after termination of the Garrett agency, was a breach of contract and in direct interference with his absolute ownership of expirations and renewals, and that the intentional interference with Garrett's expirations was a tortious interference with his contract rights. The court awarded $64,900 as compensatory damages for lost commissions from the breach of contract, plus $26,607 as the accumulated value of such commissions at 4% per annum and $25,000 as punitive damages for tortious interference with contract rights done with malice.

### Issues on Appeal

On this appeal, Farmers assigns error to the findings and conclusions of the trial court that: (1) neither the claim in contract nor the claim in tort is barred by the applicable statute of limitations (2) an enforceable oral contract subsisted between plaintiff and defendant for breach of which defendant is liable (3) Farmers operated under the American Agency System whereby Garrett owned the exclusive right to expirations and renewals data (4) Farmers maliciously interfered with Garrett's use of expirations and renewals (5) Garrett proved damages, including the right to prejudgment interest and punitive damages.

■ The rights and duties of the parties under the contract are to be determined by the law of Kansas, the state which, undoubtedly, has the most significant relationship to the transaction undertaken by them. Restatement of Contracts Second, §§ 186, 188. We test the validity of the judgment and of the assignments of error in the light of that law.

### The Agreement Is An Enforceable Oral Contract

We pass for the moment the issue whether the claim is barred by limitations and determine, first, the nature and terms of the contract of agency which governed the parties. The trial court found that Grantier as authorized representative of Farmers entered into a valid and enforceable oral contract with Garrett according to those terms which Garrett gave in testimony, and specifically, that Garrett was the sole owner of any business developed for Farmers through the agency, together with all expirations and renewal data, free from any interference by Farmers in the event of termination of the agency.

■ Farmers acknowledges that to the extent Garrett gave performance under such an agreement—concededly unilateral, terminable at will, and thus one which neither party was bound to continue—by bringing customers and servicing renewals while still an agent of Farmers, Garrett was entitled to and received commissions and goal incentives in full recompense for such executed performance. Farmers contends, however, that to the extent the agreement undertakes to vest in Garrett absolute ownership of the expirations of policies written by him in Farmers during the agency, it imposes upon Farmers a perpetual covenant not to compete for that

business, a promise made unenforceable because lacking in mutuality of obligation. It is the sense of this argument that the agreement was unilaterally executory, that Garrett made no promise to serve as agent, but that his performance in selling policies and servicing them was the consideration for payment by Farmers of commissions, service fees and bonuses, a consideration which ceased when the agency relationship ceased, and that the covenant not to compete given by Farmers without separate promissory consideration by Garrett is without mutuality of obligation and cannot support the judgment entered for its breach.[2]

Another hypothesis for the contention of lack of mutuality is that since the benefit of the expirations and renewals did not accrue to Garrett until after the termination of the agency, when Garrett no longer performed or could perform anything of value for Farmers, the promise of ownership of the expirations was without consideration.

■ These arguments are tendentious in that they assume that Garrett's performance was sufficient consideration to bind Farmers to its promise to compensate Garrett by commissions, only, but not to its promise to recognize the agent as exclusive owner of the expirations. As Farmers acknowledges, however, the agency employment extended to Garrett was a promissory offer for a unilateral contract, for a continuing relationship terminable at will. A unilateral contract, by its very nature, is one where only one of the parties makes a promise; and the consideration for such a promise is not another promise, but performance. Restatement of Contracts § 12; Corbin on Contracts § 71. A unilateral contract becomes enforceable upon performance, and the promisee is then entitled to his full bargain. Under the agreement

Garrett was not bound to place any policies with Farmers nor was Farmers bound in any way to compensate him and to refrain from interference with their expirations until he did so. In the sense that Garrett and Farmers made no reciprocal promises and therefore were not mutually bound by enforceable duties to each other—a characteristic of all unilateral contracts—it can be said that the contract lacked mutuality at the inception and for that reason was then unenforceable. Woolsey v. Ryan, 59 Kan. 601, 54 P. 664, 665 (1898). A promise lacking in mutuality at its inception, however, becomes binding on the promisor after performance by the promisee, thus want of mutuality is no defense to an executed contract. Nelson v. Schippel, 143 Kan. 546, 56 P.2d 469, 472 [6] (1936); Potucek v. Blair, 176 Kan. 263, 270 P.2d 240, 243 [1] (1954). Mutuality of obligation, more validly, means that each party to a contract is under a legal duty to the other —that there must be sufficient consideration. In this sense, even where one party has made no promise and is not bound, the contract has sufficient mutuality if that party has given executed consideration. Corbin on Contracts, § 152. Thus, each time Garrett at his own expense solicited a policyholder to whom Farmers then issued a policy, he gave an executed consideration, and Farmers become bound by its promise not to interfere with the expiration of that policy.

■ Farmers does not show on what principle of contract the promise not to interfere with the expirations of the agent is of the effect of a perpetual covenant not to compete, nor why the consideration of an executed performance will not bind such a promise, nor why a present performance will not support a future benefit. In any event, the oral contract established

---

2. In argument, Farmers treats the promise not to interfere with the expirations and renewals of those policies placed by Garrett with Farmers as a covenant not to compete which Farmers contends, requires a separate consideration, citing National Motor Club of Missouri, Inc. v. Noe, 475 S.W.2d 16 (Mo. 1972). This decision does not bear on the proposition Farmers asserts, but stands for no more than the general rule that past or moral consideration is not sufficient to support a promise.

by the evidence and found by the court included a promise by Farmers that Garrett would own his expirations and renewals. The further promise not to interfere with that ownership was not an independent covenant, but explicit recognition of the right accorded Garrett by the contract. It was a property right, moreover, which accrued immediately, not merely a deferred benefit. The right to the expirations became a valuable asset of the agency in the nature of good will. Couch on Insurance 2d, § 26:482; Phillips & Co., Inc. v. Pennsylvania Threshermen & Farmers Mutual Casualty Ins. Co., 199 F.2d 244, 246 [1] (4th Cir. 1952); Avery v. City of Lyons, 183 Kan. 611, 331 P.2d 906, 914 [11] (1958).

 Farmers next contends that the purported oral contract upon which Garrett asserts his claims for recovery was barred by a subsequent written contract composed by his written application and Farmer's letter of appointment, and that the contents of the agent's manual, to which the letter of appointment makes reference, must be taken as having been incorporated into the contract. It is the settled rule that if parties to an oral agreement later execute a writing that they mutually agree shall be the full and complete expression of the prior agreement, the agreement becomes integrated into the written contract and, under the parole evidence rule, the written expression may not be varied or contradicted by prior or contemporaneous oral agreements. Corbin on Contracts, § 1319; Restatement of Contracts, §§ 228, 447. To suggest, as does Farmers, however, that the oral agreement between Grantier and Garrett was intended as merely an overture to a final contract embodied in the application and letter of appointment is to assume more than the evidence allows. The application was merely an inquiry into Garrett's background, and the letter of appointment was both an expression of welcome and notification that the company had requisitioned Garrett's license from the Insurance Department that his supplies and

manual were forthcoming. Not only do these writings fail to fully and completely cover the terms of the oral agreement, but there was no evidence that Garrett assented to these writings as the final statement of their contract, and without such assent there was no integration. Moreover, the only provision in the manual [contended by Farmers to have been incorporated by reference into the written agreement] which relates even remotely to expirations data is the provision which states the conditions on which policies may be transferred from one agent to another. The finding of the trial court, therefore, that an express oral contract of agency arose between Garrett and Farmers, terminable at will, which vested Garrett the exclusive right to his expirations free from interference from Farmers, was supported by the evidence.

In the posture of our decision that an express, enforceable oral contract subsisted between the parties whereby Garrett had exclusive ownership of the expirations of policies written by him with Farmers, the finding of the trial court that Farmers operated under the American Agency System is superfluous, and we do not address the contentions of the parties on that issue.

*The Claim for Relief as Based Upon the Right to Expirations*

 It is the purport of the American Agency System that [Woodruff v. Auto Owners Ins. Co., 300 Mich. 54, 1 N.W.2d 450, 452 (1942)]:

> . . . upon termination of an insurance agency, if the agent's financial obligations to the company are paid in full, all rights in the expiration data of existing insurance procured by the agent belong to him.

Under traditional rules of agency, the customer list of the agent belonged to the insurer-principal, but in fire and casualty insurance, a different custom arose whereby the independent agent—in the absence of contract to the contrary—has a property right in the expiration information compiled

as part of his records. Port Inv. Co. v. Oregon Mut. Fire Ins. Co., 163 Or. 1, 94 P.2d 734, 739 [1–3] (banc 1939); Ballagh v. Polk-Warren Mutual Insurance Ass'n, 257 Iowa 1334, 136 N.W.2d 496, 500 [7] (1955); Kelly v. American Mine Owner's Cas. Corp., 161 Va. 206, 170 S.E. 580, 581 [3] (1933). This divergence from traditional principles treats the independent insurance agent as an independent businessman, a status given judicial recognition on the rationale that [Heyl v. Emery & Kaufman, Ltd., 204 F.2d 137, 139 (5th Cir. 1953)]:

> Because of the peculiar nature of the agency relationship, in that the casualty or fire insurance agent, in soliciting insurance business, does not solicit on behalf of any particular company, but actually on behalf of the agency, and then allots the business to such one of his companies represented by him as he may determine, it is generally held that since the information obtained in such solicitation and in the preparation of the policies is gathered by the agent at his own expense, and expirations are the property of the agent.

See, also 49 Boston U.L.R. 286 (1969), Independent Insurance Agency Agreements and the Termination of Agency.

Farmers accorded to Garrett by contract those rights which, under the American Agency System, would have flowed to him by custom. When a subsisting contract of agency addresses itself to the ownership of expirations and renewals, those terms are controlling. Ballagh v. Polk-Warren Mutual Ins. Ass'n, *supra*, 136 N.W.2d 1. c. 498; Kerr & Elliott v. Green Mountain Mut. Fire Ins. Co., 111 Vt. 502, 18 A.2d 164, 168 [2] (1941); V. L. Phillips & Co. v. Pennsylvania Threshermen, Etc., *supra*, 199 F.2d 1. c. 247 [2]. And since a custom or usage cannot be shown to vary the terms of a contract plainly stated, we need not test the validity of the finding of the trial court that, as to the ownership of expirations, Farmers and

Garrett were operating under the American Agency System. Port Inv. Co. v. Oregon Mutual Fire Ins. Co., *supra,* 94 P.2d 1. c. 740 [4]; Kerr & Elliott v. Green Mountain Mut. Fire Ins. Co., *supra,* 18 A.2d 1. c. 168 [2]; 21 Am.Jur.2d, Custom and Usages, § 26.

## The Award of Punitive Damages

Whether the right of an agent to expirations upon his termination rests on custom or express contract, however, a malicious interference by the principal with that right gives rise to a cause of action in tort. The proof of malice does not require direct evidence but may be presumed from the intentional commission of a wrongful act. Woodruff v. Auto Owners Ins. Co., *supra,* 1 N.W.2d 1. c. 453 et seq. [4], [16–19]; Northwest Underwriters, Inc. v. Hamilton, 151 F.2d 389, 391 [1–3] (8th Cir. 1945). Farmers asserts, however, that there was no improper or malicious interference with Garrett's expirations which could form the basis for an action in tort and support the award of punitive damages. The amended petition pleaded a conspiracy among Farmers, Farmers Mutual Services [manager of the insurance company] and Caskey [State Director for Missouri] to wrongfully and maliciously deprive Garrett of his property rights in his expirations. The two alleged conspirators were dismissed at the close of plaintiff's evidence, so the only question is whether there was competent evidence of unlawful acts by Farmers.

The effect of the contract between Garrett and Farmers [as well as the American Agency System custom] was to deny to the insurer its otherwise legitimate right to appropriate to itself or to its other agents the business of the terminated agent. The insurer was not thereby precluded, however, from all communication with persons to whom its policies issued through the discontinued agency, but could properly notify such assureds of the termination of the agency and to designate the

**114**

person who would service such policies, provided the insurer not attempt to appropriate the business which belongs to the terminated agent. Woodruff v. Auto Owners Ins. Co., *supra,* 1 N.W.2d 1. c. 453.

■ The form letter sent in March 9th and 10th of 1955 by Farmers to holders of policies written by Garrett which announced the termination of agency and designation of Dwayne Marsden as agent for servicing claims under existing policies was ostensibly an exercise of this prerogative and, on its face, violated no right of the terminated agent. This letter, innocuous in tone, concealed a disingenuous design to deprive Garrett of his business. In January of 1955, after it became evident that Garrett and other agents would not accede to the Metropolitan Area Plan, the Agency Secretary from the home office wrote to the Kansas Director with specific reference to Garrett: "Could you tell me if you have any idea as *to whom we should assign his business?*[3] Grantier had advised the Agency Department that *"the transfer of the business* of those agents cancelled in the Kansas City area should be completed as follows: . . . Ted Garrett to Dwayne Marsden". In February of 1955 the Agency Secretary confirmed with Grantier that Farmers would "go ahead with *the transfer of business that you indicated.* That is . . . [t]he business of Garrett to Dwayne Marsden." This decision was implemented by another inter-office memorandum which also directed that copies of policies [expirations] be made for the new agent. A later February memorandum from Grantier to the Agency Secretary refers again to the transfer of business from Garrett to Marsden, and in that connection stresses the importance of the proposed letters to the policyholders, acknowledging that this procedure was being contested by Garrett. Finally, the Agency Secretary informed Grantier that the dailies [expirations] of policies written by Garrett would be forth-coming. The letters of March 9th and 10th of 1955 to the policyholders written by Garrett followed shortly thereafter.

Farmers contends that Marsden was appointed simply to service the policies written by Garrett, just as represented in the letters mailed to the policyholders. Marsden testified that as to these policyholders, his function was to process accident reports, car changes and perform kindred services. The activity actually practiced by both Marsden and Farmers, however, was a deliberate interference with the property rights of the terminated agent. Soon after Farmers notified policyholders written by Garrett that his agency had been terminated, Marsden began to call on them. These calls, from a tabulation of Garrett policyholders furnished by Farmers, were made without invitation from the policyholders or pretence for the need to service existing policies, but as a prelude to future solicitation. In Marsden's words, the purpose of these calls was: "For them to know who I was and where I was. I would take care of the insurance later." By the end of the year, February 1956, Marsden had acquired the business of 228 of Garrett's policyholders. Marsden admits that Garrett called him more than once to protest his activity, but Marsden made no response.

Farmers contends there was no proof of solicitation by Marsden and for that reason the judgment for punitive damages may not stand. The evidence clearly shows, however, that, if nothing else, Marsden was both the instrument and beneficiary of Farmer's own unlawful solicitations of the Garrett policyholders. The inter-office communications establish that Marsden was designated by Farmers as the transferee of Garrett's business. After the termination of the Garrett agency, Farmers continued its practice of sending out renewal notices to the Garrett policyholders. Farmers acknowledged that these notices were nothing more than solicitations for

---

3. The emphases throughout the exposition of this point have been added.

the business of the terminated agent. In response to a letter from Garrett's counsel in January of 1955 which requested that Farmers refrain from issuing renewal notices and renewal certificates to policyholders written in the Garrett agency, Kinnamon cited custom for his refusal, and then added: "There never is a closed season to our knowledge, with respect to the solicitation of insurance by any agent for any company."

While Farmers was bound by its agency agreement to relieve Garrett of office and paper work, including issuance of policies of insurance and notices of renewal [in consideration of acceptance by Garrett of an 8% commission on new business rather than the customary 25%], Farmers proved no custom for the continuation of renewal notices to policyholders of a terminated agent. The evidence was to the contrary: When agent Lloyd Bell was terminated by Farmers on February 1, 1955 for refusal to accede to the Metropolitan Area Plan, Kinnamon sent this letter to the Bell policyholders:

> Since the agent who wrote your policy no longer represents us, this letter is the only notice you will receive from this company.
>
> If you wish to keep your car insured, we suggest that you contact your agent and he will be glad to give you the necessary assistance.

Quite clearly, Farmers recognized that any obligation or custom which validated the solicitation of renewals during the continuation of an agency did not legitimate the practice after termination of that agency.

█ It is also evident that Farmers recognized that Garrett had a right of property in the expirations solicited and renewed by the company after the termination of the agency. There would have

been no purpose, otherwise, in the remittances from Farmers through Marsden to Garrett. When Farmers transferred the Garrett business to Marsden, it was also arranged that Marsden was to receive all the commissions on the Garrett expirations renewed with Farmers, but that Marsden was to remit to Garrett renewal commissions on such business for one year. The accrual of commissions thereafter was Marsden's to keep. Farmers describes this course of dealing as a "constructive purchase of [Garrett's] customer list at the rate which had long prevailed between agents for sales of expirations and renewal data". We reject this apologia as nothing more than an euphemism for the unlawful appropriation of the property right of another.[4] It is clear that the Garrett business was transferred to Marsden not as caretaker, as Farmers contends, but as owner. Marsden enhanced that ownership by solicitations of the Garrett policyholders and Farmers, by the notices of renewals. These were deliberate acts of the insurance company to defeat Garrett's use and control of expirations which Farmers had agreed were his absolute property. Such was a show of malice and will support an award of vindictive damages. Watkins v. Layton, 182 Kan. 702, 324 P.2d 130, 135[12–13] (1958); Hess v. Jarboe, 201 Kan. 705, 443 P.2d 294, 297[4–5] (1968).

*The Award of Compensatory Damages for Breach of Contract*

Farmers next contends that the evidence on injury and damages from breach of contract was incompetently speculative. The factual basis for the award of $64,900 in compensatory damages was in evidence that Garrett had lost 700 policy accounts by reason of Farmers' wrongdoing. Garrett derived this policy count from the month-end statements from Farmers for August, September and October of 1954,

---

4. It may be only coincidence that the formula used by Farmers in its unilateral determination of the value of the Garrett expirations—commissions on renewals for the twelve months following termination—was that offered to Garrett by the Metropolitan Area Plan, and refused by him.

which represented that as of the last day of July of 1954, 1049 policies written by Garrett were in force with the company. Since several of these policies were for his personal use, Garrett adopted 1043 policies as the basis for his damages. Of this number, 343 were retained by Garrett as his clients which left [in rounded numbers] 700 expirations which Garrett did not retain and for which he claimed damage.

In computing damage, Garrett took into account an attrition rate of 11%, that is, that by the end of the second year eleven out of every hundred policies would have lapsed. This lapse ratio was derived by the analysis that of the 343 policies retained by him in 1955, by 1971, sixteen years later, 54 of the policyholders remained as clients. Garrett determined also that these 54 remaining policyholders were presently paying an average annual premium of $323.85 compared to an average premium of $67 in 1955. The increase in annual premium on the 54 accounts amounted to a rate increase of 11% per year. Garrett then applied the formula of 11% lapse ratio and 11% premium increase to each of the 700 policies he did not retain. The projection for the years between 1955 and 1971 shows a loss to Garrett of $64,900 in anticipated commissions, the amount awarded by the court as compensatory damages.

Farmers disputes that the July 1954 count of 1043 policies in effect was a valid basis for computation of damages and contends that by February 1, 1955, when his agency terminated, Garrett had no more than 683 policies in effect with the company and had, for all intents and purposes, stopped writing policies for Farmers. Farmers contends that by the next quarterly policy count, as of the end of October of 1954, Garrett's policies in force had declined to 999, and from then until the next quarterly count, on January 30, 1955 [and, coincidentally, the last day of the agency] that number was reduced to 683. This reduction Farmers contends, resulted when, during 1954 and continuing into January of 1955, Garrett began to renew policies in companies other than Farmers. Of this 683 number, Farmers further contends, Garrett by his own account salvaged 343 policies, and the 228 admittedly credited to the Marsden account, leaves but 112 unaccounted for, a number which could have readily lapsed by normal attrition.

In this computation, however, Farmers makes an assumption which is consistent with neither the evidence nor the finding of the trial court on the issue of damages to which it relates. Farmers assumes that the 343 policies retained by Garrett as his own business were garnered by him *after* his termination on February 1, 1955, and thus must be added to those switched by Garrett to other companies during the period before termination in order to arrive at a basis for damages. Garrett testified, however, that the retention of 343 policies represents his total effort, an effort which extended *before and beyond* his termination on February 1, 1955. And, indeed, the record shows no documentary or testimonial evidence to rebut this contention. The vortex of this dispute is the calamitous lapse ratio which suddenly appeared in the Garrett renewals after November of 1954 until his termination on February 1, 1955. The entries Garrett compiled from Farmers records disclose that during that period 308 policyholders did not renew, an attrition rate in excess of 66 percent. Farmers contends that these 308 policies, or most of them, were switched by Garrett to other insurers before his termination, a contention Garrett denies. It is evident that in ascertainment of damages, the trial court accepted the Garrett testimony that he retained only 343 policies altogether, both before and after termination.

The question remains whether the July 31, 1954 count of 1043 policies in effect, asserted by Garrett and adopted by the trial court, allows a reasonable basis for the computation of damages under the evidence. Garrett appears to contend [and the trial court expressly found] that the

attempt by Farmers to impose the acceptance of the Metropolitan Area Plan was in breach of the original contract between them, a breach which had become manifest by July 31, 1954, and therefore the policy count on the date was the proper basis for computation of damages. The contract between Garrett and Farmers, however, was unilateral and to the extent that it remained executory was terminable at will, thus the introduction of new contractual conditions by Farmers worked a termination of the undertaking still executory between them, and not a breach of a promise for performance already given by Garrett. On the same principle, that the contract of agency terminated on February 1, 1955 does not alone validate the calculation of Garrett's damages on 683 policy count of that date if Farmers interfered with his right to expirations, and thus breached the contract, prior to termination.

There was, in fact, evidence that Farmers and its agents had interfered with the Garrett expirations before the termination of his agency. As we have shown, Marsden admitted overtures to Garrett policyholders and Garrett, prior to his termination, had called Marsden to protest these solicitations. Garrett also gave evidence that some time before his termination notice of December 31, 1954, he had received calls from some of his Farmers policyholders that other Farmers agents, licensed in Missouri, had been soliciting them. These agents were identified as Robertson, Blystone, Rimmer and Feese. Marsden, himself, testified that he learned through a policyholder that Feese was soliciting Garrett business, and that he was told by Rimmer that he was doing the same. Garrett testified that in November of 1954 he had called Rimmer and Blystone to protest their solicitations of his policyholders. In January of 1955, Garrett lodged a formal complaint with the Kansas Commissioner of Insurance of these incursions into Kansas by the Missouri Farmers agents. Grantier was called to the meeting and

reprimanded and admonished not to permit a recurrence.

■ We agree with Farmers that the substance of the telephone conversation between Garrett and his policyholders that they had been solicited by the specified Missouri agents was not, over the trial objection of Farmers, probative of solicitations of the Garrett business or of interference with his expirations. We disagree, however, that there was no substantial proof of such a malicious interference with his rights during the contract period. The proceeding before the Kansas Commissioner of Insurance was some proof that Farmers Missouri agents had been active in Kansas, and the deposition testimony of Marsden [received without objection] to the effect that Rimmer and Feese, both Missouri agents cited to the Commissioner, had solicited Garrett business was both corroborative and independent proof of such activity and that it had been directed against Garrett's rights of property. This evidence, taken with the testimony given by Garrett that, during the pre-termination period, Marsden continued his solicitations of Garrett policyholders even after protest was made, was probative of malicious interference by Farmers agents with the Garrett right of expirations during November and December of 1954 and January of 1955.

■ The proper basis for computation of damages, therefore, was not the 1043 policy count of July 31, 1954 adopted by the trial court, since no breach of expiration rights appears until November of 1954, thus the diminution of the policy count to 999 units by October 31, 1954 could not have been caused by any unwarranted activity by Farmers or its agents; nor does the January 31, 1955 policy count of 683 suggested by Farmers—which discounts completely any loss from interference before the termination of the contract —allow a reliable basis for damages.

For these reasons, the ascertainment of damages must proceed on the policy count of 999 made by Farmers on October 31, 1954. On that basis, a trier of fact could reasonably have found that the loss of 308 renewals[5] extending from November of 1954 into January of 1955 resulted from the interference by Marsden and the Missouri agents with the Garrett expirations, and was substantial evidence on that issue.[6] Walter v. Alt, 348 Mo. 53, 152 S.W.2d 135, 143[4] (1941).

▆▆▆ Farmers contends, however, that such a proof of damages remains speculative. It is the general rule that damages must be made reasonably certain by competent proof and cannot be based on conjecture. Avery v. City of Lyons, 183 Kan. 611, 331 P.2d 906, 913 (1958). Where computation of damages is made uncertain by the nature of the breach of contract, "[t]he most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created." Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 265, 66 S.Ct. 574, 580, 90 L.Ed. 652 (1946); Novo Industrial Corp. v. Nissen, 30 Wis.2d 123, 140 N.W. 2d 280, 285[10] (1966); 22 Am.Jur.2d § 23, p. 42. The covert manner of the breach considered, Garrett proved all the damage capable of proof and he will not be denied compensation because the nature of the wrongdoing prevented a more fastidious demonstration of loss.

▆▆▆ Farmers quite properly insists that under Kansas law damages are based on net profit, and not the gross income, on business lost. Avery v. City of Lyons, *supra*, 331 P.2d l. c. 913; 3 C.J.S. Agency § 557b. Farmers contends that the recovery given Garrett based upon gross loss of commissions, which does not take into account the cost of servicing the policies and soliciting additional coverages, remains speculative. We disagree. It was the evidence that Garrett was agent for insurers other than Farmers. For these other principals, Garrett not only solicited the initial policy, but issued them, solicited the renewals and issued policies on them, remitted premiums to the insurers, and bore the expense of all office work to conduct this business. These expenses were offset by a commission to Garrett of twenty-five percent of the premium charged. The arrangement with Farmers was significantly different. Garrett received a commission of eight percent rather than the conventional twenty-five percent on new policies written, but once Garrett forwarded to Farmers the written application of the customer for insurance, the company did all the transactional work, including issuance of policy, collection of premiums and giving notice of renewal. While the original solicitation of policies placed with Farmers involved expense to Garrett, that cost does not bear on the recovery of damages for loss of commissions on expirations and renewals of policies already in effect. Although it may be assumed that there was some incidental expense to Garrett in the renewal of expirations, none of any substance appears as the cost of such performance. The evidence fairly supports the conclusion that the operating expenses of the Garrett agency were identifiable with the business produced for his other principals and with the acquisition of new business for Farmers. In such circumstances, the gross loss of commissions was properly awarded as net profits, since the expenses of the Garrett operation would not have significantly increased had the

5. When 308 is subtracted from 999 [the policy count as of October 30, 1954], 691 remains, a count very close to the 683 actually shown to have been in effect on January 31, 1955.

6. A policy count of 999 as the basis for computation of damages [less 343 policies retained by Garrett] results in proof that 656

policies [including the 228 admittedly retained by Farmers and assigned to Marsden] were lost to Garrett from the interference by Farmers and its agents. The loss of commissions is computed for the period in question by the application to 656 policies of the formula of an 11% lapse ratio and an 11% increment in premiums.

contract not been breached. 25 C.J.S. Damages § 90, p. 976.

### The Bar of Limitations and the Garrett Amended Petition

The appellant contends next that the claims for breach of the express oral contract between Farmers and Garrett and for the tortious interference by Farmers with the Garrett expirations are barred by the applicable statutes of limitations. The Missouri borrowing statute, § 516.190, V. A.M.S., 1974 Supp., provides that whenever a cause of action is fully barred by the laws of the state where it arose, that bar is a complete defense to any action thereon in the courts of this state. The legal effect of the statute is to render the Kansas enactments on limitations, as construed by the case law of that state, the rule of decision which determines that issue on this appeal. Bowling v. S. S. Kresge Company, 431 S.W.2d 191, 193[1] (Mo. 1968).

The original petition filed by Garrett in the Circuit Court was in two counts, one for breach of oral contract and the other in tort. The amended petition upon which evidence was heard and judgment entered was in one count and pleaded a single cause of action for malicious interference with the contract right to expirations, for which Garrett sought compensatory and punitive damages. The trial court found that the breach of contract did not accrue until the termination of the agency by Farmers on February 1, 1955, and that the tort action [conceived by the trial court to be a continuing wrong] did not accrue until February 1, 1956, when Farmers first gave Garrett an accounting of the customers taken by Marsden from Garrett, and thus neither the three-year limitations governing actions on contracts not in writing, nor the two-year limitations governing tortious injury to personal property [§ 60–513(1) and § 60–513(2), K.S.A.; 1972 Supp., respectively] was applicable to the action commenced January 30, 1958 by the original petition. The effect of these findings is that the cause of action declared by the amended petition upon which trial was had was not affected by limitations. The argument of appellant, which treats the amended petition as a pleading of separate causes of action for breach of contract and tortious interference with contract rights and which asserts the bar of limitations as to each, is quite in error. The amended petition upon which Garrett had recovery for both compensatory and punitive damages pleaded [as our later discussion discloses] a single cause of action: a breach of contract which also amounted to a willful tort. It is a remedy recognized by the law of Kansas. Moffet v. Kansas City Fire & Marine Ins. Co., 173 Kan. 52, 244 P.2d 228, 233[6–10] (1952).

The question remains: which limitations period applies, that for three years governing contracts not in writing, or that for two years governing tortious injury to personal property? That determination is to be made from the actual nature of the cause of action or right sued upon. Orozem v. McNeill, 103 Kan. 429, 175 P. 633 (1918), on reh. 103 Kan. 694, 176 P. 106; 51 Am.Jur.2d, Limitations of Actions, § 62. The wrong which Garrett alleged was dealt him was the breach of the contract right for exclusive ownership of the expirations. The measure of recovery, commissions lost due to the breach, is contractual in nature as it compensated plaintiff for his pecuniary loss which was within the reasonable expectation of the parties. Hess v. Jarboe, *supra*, 443 P.2d 1. c. 297[3]. The trial court found that Farmers had breached its contract with plaintiff and awarded actual damages on that theory. The only element of the action and judgment which sounds in tort is the prayer for and award of punitive damages, but that award was merely a penalty for the benefit illegally gotten by Farmers from its breach of the contract. Scheps v. Giles, Tex.Civ.App., 222 S.W. 348, 349 (1920).

The Kansas decisions clearly indicate that when doubt arises as to the limitations period to apply to an action, the court will look to the pleading to determine the real basis of the action. When doubt exists as to whether an action is based upon tort or implied contract, words appropriate to the tort will be disregarded and the petition taken as sounding in contract to which the longer limitations period will be applied. Juhnke v. Hess, 211 Kan. 438, 506 P.2d 1142, 1145[1] (1973); Dougherty v. Norlin, 147 Kan. 565, 78 P.2d 65, 67[2] (1938). In the case we consider, the agreement was an express contract and there is no doubt that the breach of that contract is the chief wrong complained of. These Kansas decisions, which apply the longer limitations period where doubt arises, further support the application of the three-year limitations period to this action.

*The Recovery of Punitive Damages for Breach of Contract*

 It is the contention of Farmers that punitive damages are not available on a claim *ex contractu*. The traditional rule that punitive damages are not recoverable in an action for breach of contract is posited on the policy that to allow issues of motives would greatly increase the intricacy and uncertainty of such litigation. In a number of jurisdictions, Kansas included, this rule has yielded the exception that where the conduct of a party to the contract has gone beyond mere breach and amounts to or is accompanied by an independent willful tort, punitive damages are recoverable for the breach. That is to say, under certain circumstances, the law imposes upon the parties to a contract an affirmative duty of conduct the breach of which gives rise to an independent tort for which punitive damages may be recoverable. 5 Corbin, Contracts, § 1019 (1964); McCormick, Damages, § 81 (1935); 56 Mich.L.R. 448 (1958); 70 Harv.L.R. 517, 531 (1956). The Kansas decisions have formulated this expression of the exception

(Moffet v. Kansas City Fire & Marine Ins. Co., *supra,* 244 P.2d 1. c. 233[6]):

As a general rule, damages for breach of contract are limited to pecuniary loss sustained. According to the overwhelming weight of authority exemplary or punitive damages are not recoverable in actions for breach of contract in the absence of independent tort or wrong causing additional injury and in a few other situations not present here.

See, also, Hess v. Jarboe, 201 Kan. 705, 443 P.2d 294, 297[3–5] (1968); Mabery v. Western Casualty & Surety Co., 173 Kan. 586, 250 P.2d 824, 830[6] (1952). The award of punitive damages in such cases must rest on proof that the conduct was not only tortious but done with malice, fraud or wanton disregard for the rights of others. Hess v. Jarboe, *supra,* 443 P.2d 1. c. 296[1, 2]. Farmers contends that the Kansas rule means that punitive damages are not available in an action on contract unless the breach and the tort are occasioned by different conduct and unless the tort gives rise to actual damages additional to those recoverable *ex contractu*. The Kansas cases which adopt the rule do not explain the requirement of "an independent tort or wrong causing additional injury", and to that extent, this statement of principle remains rudimentary.

The courts of Texas were among the first to formulate the exception which allows recovery of exemplary damages where the breach of contract amounts to a tort. In language which recalls *Moffet,* the earliest expression of the rule in Texas was given in Hooks v. Fitzenrieter, 76 Tex. 277, 13 S.W. 230 (1890):

The allegations upon which the exemplary damages are sought, should show that the manner in which the breach was committed by the defendant amounted to a tort, for which an action would lie for exemplary damages, independently of any right to recover actual damages by reason of the breach of the contract alone.

As in Kansas, so in Texas, the award of exemplary damages rests upon a showing that the tort was accompanied by fraud, malice or oppression. Gulf Coast & Santa Fe Ry. Co. v. Levy, 59 Tex. 542, 46 Am. Rep. 269 (1883); Tignor v. Toney, 13 Tex.Civ.App. 518, 35 S.W. 881 (1896); Burnett v. Edling, 19 Tex.Civ.App. 711, 48 S.W. 775 (1898); Anno.,Punitive Damages for Breach of Contract, 84 A.L.R. 1352. The measure of recovery of actual damages in such cases is the contract measure, and the exemplary damages merely reflect the aggravated nature of the tortious breach. Scheps v. Giles, *supra*; Briggs v. Rodriguez, 236 S.W.2d 510, 515[8–13] (Tex.Civ.App.1951). And since a breach of contract may amount to a tort, the same operative facts may give rise to both. Briggs v. Rodriguez, *supra*, 236 S.W.2d l. c. 515; A. L. Carter Lumber Co. v. Saide, 140 Tex. 523, 168 S.W.2d 629, 631 (1943). We have concluded on the persuasive analogy of these decisions that the rationale developed by Texas courts inheres also in the Kansas statement of the rule.

The rule properly stated, then, is not that plaintiff must plead and recover upon an independent tort, but that the manner in which the breach occurred constitutes a willful tort for which an action for exemplary damages will lie. Briggs v. Rodriguez, *supra*, 236 S.W.2d l. c. 515[8–13]; Export Insurance Company v. Herrera, 426 S.W.2d 895, 900[5] (Tex.Civ.App.1968). To require proof and award of actual damages for a tort in addition to such proof and award for contract breach as predicate for punitive damages—as Farmers contends—would distort the nature of the remedy and allow the anomalous result of a double recovery.

A principal owes an affirmative duty to refrain from interference with the contract right of his agent to expirations, the breach of which gives rise to an independent tort. Woodruff v. Auto Owners Ins. Co., 300 Mich. 54, 1 N.W.2d 450, 456 (1942); Northwest Underwriters, Inc. v. Hamilton (8th Cir.), 151 F.2d 389, 392[3]

(1945). The proof shows a willful breach of this duty and supports the award of punitive damages.

The trial court found that the cause of action on the oral contract accrued on February 1, 1955, the effective date of the agency termination, and therefore the petition filed on January 30, 1958, was timely. Farmers contends that Garrett claimed and was awarded damages for solicitations of his expirations by Farmers agents *before* February 1, 1955, and thus the breach by Farmers of its promise not to interfere with that contract right occurred before the termination of the agency, and was barred by limitations. Farmers contends that, in any event, the cause of action accrued no later than December 21, 1954, when Farmers informed Garrett by letter that he was to be terminated effective February 1, 1955, which notice constituted the final act of repudiation of the contract of oral agency and was such a breach [citing Burch v. Union Life Ins. Co., 319 S.W.2d 908 (Mo.App.1959)] as gives immediate right of action for the entire damages. The contract between Farmers and Garrett, however, was terminable at will, and termination according to its terms could not have been a breach. The question remains whether the interference with the expirations by Farmers before the termination of the contract amounted to the anticipatory repudiation of the performance promised by Farmers so as to give rise to an immediate cause of action for the entire damages.

It is, as Farmers contends, that under the law of Kansas an action for breach of contract accrues at the time of breach [Freeto Construction Co. v. American Hoist Derrick Co., 203 Kan. 741, 457 P.2d 1, 5[3, 4] (1969)], but recitation of this general rule hardly establishes that the doctrine of anticipatory repudiation governs and disposes of the issue here. Nor is the other decision cited by Farmers, Christenson v. Akin, 183 Kan. 207, 326 P.2d 313 (1958), helpful on this point be-

cause no repudiation or renunciation prior to the time of performance was involved.

The agreement between Garrett and Farmers was in the nature of a unilateral contract. In return for the performance given by Garrett, Farmers promised to compensate him with commissions and to respect his exclusive ownership of his expirations *upon the termination of his agency.* Each policy placed by Garrett with Farmers constituted executed performance by him; *as to these, the promise by Farmers not to interfere with expirations became executory, to be performed if and when the agency was terminated.* The doctrine of anticipatory breach applies only where a contract of *interdependent covenants* is mutually executory not in cases where the promisee has performed under a unilateral contract. Burch v. Union Life Ins. Co., *supra,* 319 S.W.2d l. c. 913. This is also the statement of the Kansas law on the subject. Mabery v. Western Casualty & Surety Co., 173 Kan. 586, 250 P.2d 824 (1952) involved the breach of an oral contract. The originally executory bilateral contract had become unilateral through the performance of the plaintiff-promisee and the court held, upon extensive authority, that an immediate action for anticipatory repudiation by the promisor does not lie under a unilateral contract. The rationale is given at page 828[1] :

> In a unilateral contract for the performance of several disconnected acts . . . a breach as to one or any number less than the whole of the promised acts is generally partial.
>
> . . . . . .
>
> [W]hen the only requirement of the contract is the promisory's future performance it more obviously is unjust to hold him liable to action immediately, than where performances are to be rendered by both parties. In the latter case, waiting until the agreed time has its effect on the whole agreed exchange; in the former case, allowing the promisee im-

mediate recovery is nothing but a direct bonus to the promisee beyond what he was promised and a direct penalty to the promisor.

. . . . . .

The doctrine of anticipatory breach applies to contracts which embody mutual and interdependent conditions and obligations.

. . . . . .

The general rule is that the doctrine of anticipatory breach does not apply to a contract which the complaining party has fully performed.

The trial court properly found that the cause of action for breach of contract did not accrue to Garrett until the termination of the agency and that the petition was timely filed.

### The Award of Prejudgment Interest

The award for compensatory damages for $91,507 included $26,607 in prejudgment interest. Farmers contends that this award was on an unliquidated claim and thus contrary to law. It is the rule in Kansas that prejudgment interest is not recoverable on unliquidated damages which are not ascertainable by computation or measured by some fixed standard. Lower v. Shorthill, 103 Kan. 904, 176 P. 647 (1918); Foster v. City of Augusta, 174 Kan. 324, 256 P.2d 121, 127[12] (1953). In each of these cases, cited by Farmers, prejudgment interest was disallowed on the grounds that the action sounded in tort and the damages were unliquidated and unascertainable by computation before judgment was entered. The damages awarded Garrett, however, are contract damages to compensate him for his pecuniary loss occasioned by the breach; the measure of damages—lost commissions—was within the reasonable expectation of the parties.

The real difficulty in awarding prejudgment interest on lost commissions, com-

puted from the date they would have come due, is the plain fact that exact certainty that 656 were lost as a result of Farmer's conduct cannot be achieved. In a suit against a purchaser of copper goods by the supplier for the purchase price, to which the purchaser counterclaimed for damages for delay in delivery, the court stated that interest may be awarded in a contract claim when the amount due and date on which it is due are certain. Phelps Dodge Copper Prod. Corp. v. Alpha Constr. Co., 203 Kan. 591, 455 P.2d 555, 559[2] (1969). This decision expresses the Kansas rule that [l. c. 556]:

> A claim becomes liquidated when both the amount due and the date on which it is due are fixed and certain, or when the same become definitely ascertainable by mathematical computation.

*Phelps* cites as authority Clogston v. White, 127 Kan. 399, 273 P. 458 (1929) which, on rehearing [127 Kan. 668, 274 P. 745] held that where the amount due on a contract presents a jury question, interest is allowable only from the date of the judgment. To the same effect is Bridgeport Mach. Co. v. Hopper, 134 Kan. 205, 5 P.2d 832, 834 (1931), also cited by the *Phelps* court. We apply this rule to the facts of this case and determine that, as to all but the 228 expirations admittedly retained by Farmers and assigned to Marsden, the number of policies lost to Farmers was not susceptible of ascertainment by computation, remained unliquidated until found by the trier of fact, and did not support an award of interest before judgment.

Accordingly, the cause is remanded to the trial court for computation of compensatory damages on the basis of loss of renewal commissions on 656 policies and for award of prejudgment interest on the 228 policies transferred by Farmers to Marsden, and in all other respects the judgment is affirmed as modified.

All concur.