_____

No. 96-2208
_____

Joel Hyatt; Bill Brooks; and          *
Roger Crombie, doing business         *
as Hyatt Legal Services               *
                                      *
        Plaintiff - Appellants*
                                      *  Appeal from the United States
     v.                               *  District Court for the Western
                                      *  District of Missouri.
Gary Robb, general partner; and       *
Anita Robb, general partner,          *
doing business as Robb and Robb       *
                                      *
        Defendants - Appellees*

_____


                Submitted: February 10, 1997

                   Filed: May 21, 1997
                        _____

Before BOWMAN and WOLLMAN, Circuit Judges, and BOGUE,* District Judge.
                        _____


BOGUE, Senior District Judge.

        In 1988, eight year old Nicole Adams was admitted to Children's Mercy
Hospital in Kansas City Missouri for routine skin graft surgery.  During
the procedure, Nicole was given an excessive

_____

        *The HONORABLE ANDREW W. BOGUE, United States District
        Judge for the District of South Dakota, sitting by
        designation.

amount of saline solution which ultimately caused her to suffer permanent blindness and brain damage. On Nicole's behalf, her mother, Julia Adams, filed suit to recover for Nicole's injuries. At the completion of all their litigation, Nicole and Julia Adams recovered roughly seven million dollars from the various defendants.

The present case arises out of the <u>Adams</u> litigation and is an action to recover the balance due pursuant to an alleged fee sharing agreement between plaintiffs, Hyatt Legal Services (Hyatt), and defendants, Anita and Gary Robb (Robb). At the close of all evidence, Hyatt moved for judgment as a matter of law. The trial court[1] denied plaintiff's motion and submitted the case to the jury, which returned a unanimous verdict in favor of the Robbs. We affirm.

I.

Hyatt Legal Services is a general practice law firm with offices in several cities. Hyatt specializes in handling fairly routine matters (e.g., wills, deeds, and uncontested divorce) on a volume basis for discounted fees. Hyatt is generally not equipped to handle sophisticated significant plaintiff's cases (e.g., medical malpractice and personal injury). Occasionally, however, clients come to Hyatt with sophisticated claims. To accommodate these clients, Hyatt has set up referral and fee sharing arrangements with law firms which specialize in handling sophisticated claims. Typically under these arrangements, if a client enters into a contingent fee agreement with Hyatt, and Hyatt believes the client should be referred to a specialty firm, the

---

[1]The Honorable John T. Maughmer, Chief U.S. Magistrate Judge.

client is so referred.  If the specialty firm then accepts the case, it shares any contingent fee with Hyatt in accordance with the existing referral and fee sharing agreement.

Defendant Robb & Robb is a law firm in Kansas City which specializes in handling sophisticated medical malpractice and personal injury cases. Hyatt alleges that Hyatt and Robb entered into a standing referral arrangement for the handling of those sophisticated claims in Robb's area of expertise which were initially obtained by the Hyatt firm.  In 1986, the Robbs received a letter from Hyatt's then managing partner, William Brooks, detailing the terms of this alleged standing agreement.[2]  Hyatt maintains that this letter created the fee sharing contract between Hyatt and Robb. According to the agreement, Hyatt argues, once Hyatt referred a client to Robb, and Robb accepted representation,

---

[2]Brooks' letter to Robb states in relevant part:

When the [Hyatt] attorney determines that a case should be co-counseled, he or she will prepare a co-counsel memorandum . . . and send the memo, plus the file, to you. Once you have received the file please do the following: . . .

2. If you determine, after speaking with the client and reviewing the file, not to take the case, then communicate this decision in writing to the client and send a copy . . . to me. . . .

3. If you decide to co-counsel the case, copy further information . . . only to the client and the [Hyatt attorney of record] and not to me.

4. At the conclusion of each case, prepare a final accounting.  Send any checks for . . . [Hyatt's] share of the fee . . . to the [attorney of record] along with a copy of the final accounting. Send a copy of the checks and the final accounting to me.

-3-

Hyatt's performance was complete.  Expenses were to be advanced by Robb, but if there was no recovery, Hyatt would reimburse Robb for 50 percent of the unrecouped expenses.  In the event of a recovery on a referred case, however, Hyatt would then be entitled to a share of the contingent fee in an amount not to exceed 16.67 percent of the total recovery.[3]  Although Robb never signed this "contract," the parties operated under some referral and fee sharing arrangement in 36 cases over a period of six years, apparently without incident.  At trial, Hyatt argued the standing agreement largely governed all of its referrals to Robb.  Robb, on the other hand, argued that before the Brooks letter, Robb had dealt exclusively with Jeanine Hassler, Hyatt's regional partner at the time.  Anita Robb testified Hassler and Robb agreed that in medical malpractice and personal injury cases the parties would negotiate referral fees on a case-by-case basis.  Anita Robb further testified that Hassler told her to disregard Brooks' letter.  She also testified that Hyatt's successive regional partners, Ray Rousch and John Feely, also followed the case-by-case fee arrangement originally entered into by Hassler and Robb.  John Feely testified that as regional partner, he had authority to negotiate fees on behalf of Hyatt and that on exceptional cases, Feely and Robb negotiated fees notwithstanding any alleged agreement.

In April 1988, Julia Adams and her sister Lexter Adams consulted with William Czarlinsky, a lawyer at one of Hyatt's Kansas City offices, to discuss certain issues relative to Nicole's

---

[3]The Brooks letter also included the following provision: "[Hyatt] and [Robb] will share the fee derived from all cases equally, i.e., 50/50."  Hyatt maintains this portion of the agreement was subsequently amended by the parties so that Hyatt's share of the fee would not exceed 16.67 percent of the total recovery.

injuries sustained at Children's Mercy Hospital.  Although there was conflicting evidence as to the reason, it is undisputed that Czarlinsky closed the Adams file after performing  some legal work for Julia and her daughter.  Several months later, Czarlinsky received an unsolicited settlement offer from trial attorney Kirk Goza, on behalf of the individuals responsible for Nicole Adams' injuries.

On March 7, 1989, shortly after he received the unsolicited offer from Goza, Czarlinsky went to Julia Adams' home intent on signing Ms. Adams to a Hyatt contingent fee agreement.  Mr. Czarlinsky testified at trial that his meeting with Ms. Adams was civil and professional and that Ms. Adams signed the contingent fee agreement without incident.  Lexter Adams testified, however, that she was at Julia's home when Czarlinsky arrived, and that Czarlinsky attempted to convince her sister to accept Goza's offer despite that Julia indicated the settlement offer was woefully low and she would not settle the case.[4]  Lexter testified the encounter between Czarlinsky and Julia escalated into a heated argument over the settlement offer which ended in Julia firing Czarlinsky and Hyatt Legal Services and demanding that Czarlinsky leave her house immediately.

John Feely was Hyatt's regional partner in charge of the Kansas City offices, and Czarlinsky's superior at the time the meeting between Czarlinsky and Julia Adams occurred.  Czarlinsky testified Ms. Adams signed the contingent fee agreement with Hyatt and that her malpractice claim was then summarily referred to Anita Robb for prosecution.  Feely testified, however, that at a luncheon with the Robbs, he learned from Anita Robb that Czarlinsky was possibly prosecuting Ms. Adams' case on his own, contrary to Hyatt

---

[4]Julia Adams died before this case was brought to trial.

policy.  Feely also testified that when he learned of the altercation between Czarlinsky and Adams he questioned Czarlinsky about the matter and Czarlinsky did not reply, giving Feely the impression that Czarlinsky had indeed tried to force a settlement on Adams and was thrown out of her house.  Feely further testified he angrily ordered Czarlinsky to give the Adams file to Anita Robb.  Both Feely and Anita Robb testified Feely told Robb that Hyatt would not demand any part of a fee recovered in the Adams case.  Rather, in light of Czarlinsky's actions at Ms. Adams house, Feely asked Robb to "bail" Hyatt out and take the Adams case outright.

In any event, Robb did take the Adams case and successfully recovered several million dollars for their clients.  Throughout the course of settlement proceedings with some of the defendants, Feely sent the following letter to Robb on behalf of Hyatt:
"Please be advised that on behalf of Hyatt Legal Services and attorney, Will Czarlinsky, there are no claims or liens for attorneys' services or expenses pertaining to the matter of Nicole Adams v. The Children's Mercy Hospital . . . ."  Hyatt maintains this letter was sent at the request of Kirk Goza merely to facilitate settlement with the settling defendants. Anita Robb testified, however, that she also requested the letter as a confirmation of Feely's assurance to her that Hyatt would not make a claim for any fees recovered in the case.  Similarly, Feely testified that he believed Hyatt was either not retained by Ms. Adams or was fired within minutes and the letter was intended to show that Hyatt indeed had no liens or claims for fees in the Adams case.  Despite Feely's assurances, Robb paid Hyatt nearly $400,000 in referral fees out of the contingent fee earned from the settlement with the settling defendants - seemingly in accordance

with the supposed referral agreement between the parties.[5]  Anita Robb explained at trial, however, that Robb advanced these fees to prevent a suit against Robb by Hyatt in the future.  Ms. Robb also testified that Robb had agreed to indemnify Ms. Adams in the event that Hyatt made claims for fees against her or Nicole in the future and that the payments were an attempt to avoid that situation.  Moreover, she indicated these payments were also in part to cultivate the ongoing business relationship that Robb and Hyatt enjoyed.

At the close of all the evidence, Hyatt moved for a judgment as a matter of law[6] on grounds that the evidence established the existence of a unilateral contract between the parties which Hyatt had fully performed, and the only contractual breach occurred in the non-payment by Robb, thereby entitling Hyatt to judgment as a matter of law.  Hyatt's motion was denied.

Although Hyatt asserts several claims of error on appeal, it maintains the trial court made only one fundamental error in the handling of the case.  Specifically, that alleged error was the failure of the trial court to recognize the contract between Hyatt and Robb as a unilateral contract and grant Hyatt's motion for judgment as a matter of law.  All other errors, Hyatt argues, are

---

[5]The <u>Adams</u> case eventually went to trial against the remaining non-settling defendants.  Hyatt filed the instant action claiming an entitlement to approximately $800,000 more in contingency fees based on the judgment entered against those defendants.

[6]Hyatt called its motion a motion for directed verdict, but we will treat it as a motion for judgment as a matter of law because a motion for judgment as a matter of law now encompasses all motions for a directed verdict or for judgment notwithstanding the verdict.  Fed.R.Civ.P. 50 (commentary).

natural consequences which flow from the improper categorization of the status of the parties in the first instance.

## II.

We review the trial court's denial of a motion for judgment as a matter of law de novo using the same standards as the trial court. Smith v. World Ins. Co., 38 F.3d 1456, 1460 (8th Cir. 1994)(citations omitted). A motion for judgment as a matter of law presents a legal question to the trial court and this court on review: whether there is sufficient evidence to support a jury verdict. Id. We view the evidence in the light most favorable to the prevailing party and must not engage in weighing or evaluation of the evidence or consider questions of credibility. Id. Judgment as a matter of law is appropriate only when all of the evidence points one way and is susceptible of no reasonable inference sustaining the position of the non-moving party. Id.

## III.

We do not agree that, as a matter of law, the evidence established there was a unilateral contract between the parties which Hyatt had performed. A unilateral contract, under Missouri law, is "a contract in which performance is based on the wish, will, or pleasure of one of the parties." Klamen v. Genuine Parts Co., 848 S.W.2d 38, 40 (Mo. App. 1993)(citation omitted). "The 'classic' unilateral contract is one in which one party promises to pay another party for services or a product which the other party may supply at his discretion." Id.

> A unilateral contract, by its very nature, is one where only one of the parties makes a promise; and the consideration for such a promise is not another promise, but performance. . . .

> A unilateral contract becomes enforceable upon performance, and the promisee is then entitled to his full bargain.

Garrity v. A.I. Processors, 850 S.W.2d 413, 417 (Mo. App. 1993)(citing Garret v. American Family Mutual Ins. Co., 520 S.W.2d 102 (Mo. App. 1974).


Hyatt maintains the evidence was undisputed that Hyatt and Robb had a "standing agreement" (evidenced by the Brooks letter) whereby Robb offered a promise in exchange for performance by Hyatt. Specifically, Hyatt argues, Robb offered to pay Hyatt 16.67 percent of any contingent fee derived from any acceptable case referred by Hyatt (the promise by Robb). Hyatt argues it then accepted the offer and made the contract enforceable by referring the Adams case to Robb (the performance by Hyatt). Assuming the parties did indeed enter into the standing agreement alleged by Hyatt, Hyatt nevertheless distorts the terms of that agreement.

Hyatt's unilateral contract theory, presumes an offer by Robb and an acceptance by performance at the "wish, will, or pleasure" of Hyatt. The Court, however, does not agree with Hyatt's characterization of the Brooks letter. As the language of Mr. Brooks' letter suggests, any referral by Hyatt is an offer to co-counsel on the case being referred. Once Hyatt determines a case is appropriate for referral and so refers the case to Robb for possible co-counseling, the parties have not, as Hyatt contends, created an enforceable contract. Rather, Robb in its discretion can either accept or reject the offer. Only in the event that Robb accepts Hyatt's offer to co-counsel, is Robb then bound to share a portion of any contingent fee recovered in the case with Hyatt. A review of the trial transcript reveals no testimony supporting Hyatt's position that Robb approached Hyatt with an offer to share fees if Hyatt would only refer personal injury or medical malpractice cases to Robb. Moreover, although the Brooks letter is

some evidence of a referral agreement between the parties, it is not dispositive of the issue, and it does not evidence a unilateral contract.

As the trial court noted, Robb does not deny that the parties were operating under some form of referral and fee sharing agreement. Nor is there much dispute that the Adams case was referred to Robb by Hyatt. What was in dispute at the close of all the evidence were the terms upon which the Adams case was referred to Robb. Both sides actively and thoroughly litigated their cases at trial. Hyatt put on evidence to support its theory that the Adams case was acquired and referred to Robb without incident pursuant to an existing unilateral agreement which Hyatt fully performed and Robb partially performed by remitting 16.67 percent of the settlement fees to Hyatt. Robb, on the other hand, presented evidence to support its theory that fees on referred cases were negotiated on a case-by-case basis notwithstanding Mr. Brooks' 1986 letter to Robb. Robb also presented evidence that Hyatt was fired by the client and that Hyatt thereafter asked Robb to "bail" Hyatt out. Robb presented evidence that Hyatt intended to claim no fees from the Adams case and that the partial payment to Hyatt was merely to protect Ms. Adams and Robb from potential suit, and to preserve the ongoing business relationship between Hyatt and Robb.

IV.

Given the conflicting evidence in this case we cannot say, as a matter of law, that all of the evidence points in favor of Hyatt's theory of the case and is susceptible of no reasonable inference sustaining Robb's position. Smith, 38 F.3d at 1460. The existence and terms of any referral and fee sharing agreement were highly contested issues properly determined by the jury. Judgment

as a matter of law was properly denied upon Hyatt's position that it had substantially performed its part of a unilateral contract and was therefore entitled to the full benefit of its bargain.

We have reviewed Hyatt's remaining asserted points of error and find they are either meritless, or moot insofar as they are premised upon the assumption of a valid enforceable unilateral contract.  Affirmed.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.